AMES et al. v. UNION PAC. RY. CO. et al.

(Circuit Court, D. Nebraska. April 5, 1894.)

RAILROAD COMPANIES—RECEIVERS— CHANGES IN REGULATIONS AND WAGES OF EMPLOYES.

Previous to the appointment of receivers of a company operating an extensive railroad system, the relations between it and its employes, and their rates of wages, had been determined mainly by certain rules, regulations, and schedules, which had remained substantially unchanged for years, and which were the results of conferences between the managers of the railroad and representatives of organizations of the employes. One of such rules and regulations was that no change should be made in them, or in the rate of wages, without certain notice to the organization whose members would be affected. *Held,* that the schedules of wages must be presumed to be reasonable and just, and that new and reduced schedules, adopted by the receivers without notice to the employes or their representatives, would not be approved by the court, although recommended by a majority of the receivers; one only of them being a practical railroad manager, and he testifying that the new schedules should not be put in

force without some modifications, and it appearing that·the allowances made by the existing schedules were in fact just and equitable, when all the conditions were considered.

This was a suit by Oliver Ames, 2d, and others, against the Union Pacific Railway Company and other companies, for the appointment of receivers of that company as insolvent. S. H. H. Clark and two others were appointed such receivers, and afterwards two additional receivers were appointed. On petition of the receivers, new rules, regulations, and schedules of wages for employes of the company, prepared by the receivers, were approved, and they were authorized to put the same in force, by order of the circuit court sitting in the district of Nebraska; but, the circuit courts sitting in other districts into which the road extended having declined to give effect to the order in those districts (60 Fed. 674), the receivers applied for a rehearing before the circuit judges.

John M. Thurston, for receivers.

George W. Vroman, chairman, for the Brotherhood of Locomotive Engineers.

C. A. M. Petrie, chairman, for the Brotherhood of Locomotive Firemen.

John L. Kissick, chairman, for the Order of Railway Conductors.

F. E. Gilliland, chairman, for the Order of Railway Telegraphers.

Henry Breitenstein, chairman, for the Union Pac. Employes' Ass'n.

Samuel D. Clark, chairman, for the Brotherhood of Railway Trainmen.

T. Fulton Gantt, Geo. L. Hodges, McClanahan & Halligan, and T. W. Harper, for several other labor organizations and the members thereof.

Before CALDWELL, Circuit Judge, and RINER, District Judge.

CALDWELL, Circuit Judge. On the 13th day of October, 1893, on a bill filed for that purpose, this court took into its possession, control, and management the Union Pacific Railway system, embracing the Union Pacific Railway proper, and some 14 other constituent and allied roads, which together constitute what is known as the "Union Pacific System." Whether the bill states a case of equitable cognizance, justifying the appointment of receivers, has not been mooted on this hearing, and we therefore express no opinion upon that question. The system of which the court assumed the management and control comprised 7,700 miles of railroad, and about 3,000 miles of water communication, and had in its employ over 22,000 men. The great body of these men had been in the employ of the company for a considerable length of time, some of them for as much as a quarter of a century. The relation of these men to the company, and their rate of wages, were determined in the main by certain written rules, regulations, and schedules, some of which had been in force for more than a quarter of a century, and all of which had been in force, substantially as they stand today, for a period of eight years and more. These rules, regulations, and schedules were the result of free and voluntary confer-

ences, held from time to time, between the managers of the railroad and the officers and representatives of the several labor organizations representing the men in the different subdivisions or branches of the service, viz.: the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen, the Order of Railway Conductors, the order of Railway Telegraphers, the Union Pacific Employes' Association, and the Brotherhood of Railway Trainmen. These labor organizations, like the rules, regulations, and schedules, had become established institutions on this system many years before the appointment of the receivers. Two of the ablest railroad managers ever in the service of this system, and probably as able as any this country has ever produced,—Mr. S. H. H. Clark and Mr. Edward Dickinson, now general manager of the road,—testify that these labor organizations on this system had improved the morals and efficiency of the men, and had rendered valuable aid to the company in perfecting and putting into force the rules and regulations governing the operation of the Union Pacific Railway, which, confessedly, have made it one of the best managed and conducted roads in the country. The managers of this great transcontinental line testify that it has been their policy to bring it up to the highest standard of efficiency, and to afford to passengers and property transported over it all the security and protection attainable by the exercise of the highest degree of intelligence on the part of those engaged in the operation of its trains, and 'they cheerfully bear testimony to the fact that their efforts in this direction have been seconded and materially aided by the labor organizations which are represented in this hearing. The good opinion of the men entertained by the managers seems to be shared by the receivers, for, in their petition to the court in this matter, they declare "that the employes, generally, upon the Union Pacific system, are reasonable, intelligent, peaceable, and law-abiding men."

Among the rules and regulations referred to and in operation when the receivers were appointed was one to the effect that no change should be made in the rules and regulations and rate of wages without first giving to the labor organization whose members would be affected by such change 30 days' notice, or other reasonable notice. On the 27th day of January, 1894, the receivers, without giving the men, or the officers of the labor organizations representing them, any notice, filed in this court a lengthy petition, stating, among other things, "that, as receivers herein, they have, from the time they entered upon their duties as such, as far as consistent with the proper discharge of their duties to the public, and with justice to their employes, inaugurated economies in every department, with a view to reduce the operating expenses as far as possible, and produce results fair to all those parties having liens upon and interests in the properties confided to the care of your receivers." "Your petitioners further represent that they conceive it to be their duty to make and carry into effect such reductions and such reforms of the rules, regulations, and schedules without application being first made to the court in that behalf,"—and stating, further, that they had "revised the schedules aforesaid, upon

principles which have seemed to them just, right, and proper." With this petition, the receivers filed what they termed "rules, regulations, and schedules," which they asked the court to approve, and order that they be put into effect on the 1st day of March, 1894, and the "employes directed to conform thereto." The petition also prayed for a very extended injunction against the employes. On the day the petition was filed, the court entered an order declaring that the rules, regulations, and schedules prepared by the receivers, and filed with their petition, were "prima facie reasonable and just," and directed that they become operative on the 1st day of March, 1894, and ordered an injunction to issue as prayed for in the petition. Upon the presentation of this petition, and the order made thereon, to the United States circuit courts for the districts of Wyoming and Colorado, those courts declined to give effect to the order in those districts, for the reason that the employes had had no notice of the proposed change. Thereupon the receivers applied to the circuit judges at their chambers in St. Louis to put the order made by the United States circuit court in Nebraska in force in the districts of Colorado and Wyoming. This the circuit judges declined to do, but directed the receivers to annul their orders adopting the new rules, regulations, and schedules; and, this having been done, they made the following order:

"In the matter of the petition for rehearing before the circuit judges of the application of the receivers for authority to place in effect new and reduced wage schedules.

"Since the action of the courts in the different districts in this circuit on the petition filed by the receivers for leave to revoke the schedules of wages of the employes in force when they were appointed, and to adopt new and reduced schedules, has not been uniform and harmonious; and since it is desirable and necessary that any order made on said petition should have a uniform operation upon the lines of railway operated by said receivers throughout the circuit; and since the receivers have revoked and annulled their action heretofore taken, ordering new wage schedules into effect on the 1st day of March, 1894, and have resolved that the entire matter of new wage schedules be held in abeyance to await further action of the court,— it is now here ordered as follows: First. That the petition of the receivers for leave to set aside and annul the schedules of wages of the employes on the Union Pacific system in force when they were appointed, and to adopt new schedules in equalizing and in some cases reducing the wages of the employes, be set down for hearing before the circuit judges at Omaha, Nebraska, on the 27th day of March, A. D. 1894. Second. That the receivers forthwith, or as soon as may be practicable, invite the proper representatives of the employes on said system to attend a conference at Omaha, Nebraska, commencing on the 15th day of March, 1894, for the purpose of conferring with S. H. H. Clark, receiver (who is hereby specially designated and selected to conduct said conference on behalf of the receivers), and such other person or persons as he may select to act with him, at which conference the entire matter of proposed changes in wage schedules shall be taken up and, as far as possible, agreed upon between the said Clark and said representatives of the employes; such conference to continue from day to day until such agreement is reached. Third. That, in case there are any matters in difference remaining unadjusted, such matters of difference shall be clearly and specifically stated and presented to the court in writing on or before said 27th day of March, 1894, and the hearing herein shall proceed as to such matters in difference before the circuit judges holding the court; and, after hearing the parties and their witnesses and counsel, the circuit judges will make such order in the premises as may be right and just. Fourth.

That the receivers grant to such representatives of the employes leave of absence to attend said conference and hearing, and furnish them transportation to Omaha and return.　　　　　　　Henry C. Caldwell,
　　　　　　　　　　　　　　　　　"Walter H. Sanborn,
　　　　　　　　　　　　　　　　　　　"Circuit Judges."

In compliance with the terms of this order, a conference between Mr. Clark and his assistants and the officers of the several labor organizations representing the employes of the court was held in Omaha. At this conference an agreement was reached as to the rules, regulations, and schedules relating to the train dispatchers and operators, which have been reported to the court and confirmed. This was one of the most difficult schedules in the whole list to adjust, and the satisfactory agreement reached in the conference shows the great value of a good-tempered, calm, and intelligent inquiry in which both sides are represented, and in which both sides learned, perhaps for the first time, the ground on which the demand is made by the one and resisted by the other. The receivers had declared to the court, in their petition filed on the 27th day of January, 1894:

"That after careful consideration of the matter, and consultation with the managing officials of the Union Pacific system, they are of the opinion that the so-called rules, regulations, and schedules of pay for train dispatchers and operators are entirely unnecessary, and they have therefor not only decided to disaffirm the same, but they have also decided that they will not prepare or establish any rules and regulations in lieu thereof; and, with respect thereto, your receivers further advise your honors that all of said train dispatchers and telegraph operators are employed on monthly salaries which are determined in consideration of all the circumstances of each particular case, and are intended to cover all the services and all the time necessary in which to perform the service required from each of said train dispatchers and operators at the several respective stations on the lines of the Union Pacific system."

And yet at the conference held, under the order of the circuit judges, the position assumed by the receivers in their petition to the court was found to be untenable, and was abandoned, and rules and regulations governing telegraphers' wages adopted.

It would serve no useful purpose here to state the causes which, in the opinion of the court, prevented an agreement between the conferees upon rules, regulations, and schedules for the other branches of the service. It is sufficient to say that they were of a character which do not in any degree militate against the usefulness or efficiency of conferences or the ability or fairness of the conferees. Freed from the state of things brought about by the erroneous proceedings of a majority of the receivers in the beginning of this business, it is highly probable that the conferees would have agreed upon all the schedules. Failing to agree, the matter was brought before the court, in accordance with the order made by the circuit judges. At the appointed time the receivers appeared in person and by attorney, and the employes by the officers of the several labor organizations to which they belong, and by their attorneys. Upon calling the case for hearing, the court directed an order to be entered setting aside and vacating the order of the court made on the 27th day of January, 1894, approving the rules, regulations, and schedules framed by the receivers without notice to or conference with the employes affected thereby, and

also setting aside and vacating the order of injunction entered at the same time. The court then announced to counsel that the rules, regulations, and schedules in force when the receivers were appointed were still in force, and would be held and treated as prima facie just and reasonable, and that the burden was cast upon the receivers to show that the wages received by the court's employes under the existing regulations were in excess of a fair, just, and reasonable compensation for the service performed, taking into consideration all the circumstances and in view of the existing conditions. The hearing proceeded on these lines, and the court listened for a week to the testimony of witnesses.

Before stating the conclusions we have reached upon the facts, it will be well to state the leading principles which courts of equity must keep in view in this class of cases. When a court of equity takes upon itself the conduct and operation of a great line of railroad, the men engaged in conducting the business and operating the road become the employes of the court, and are subject to its orders in all matters relating to the discharge of their duties, and entitled to its protection. The first and supreme duty of a court when it engages in the business of operating a railroad is to operate it efficiently and safely. No pains and no reasonable expense are to be spared in the accomplishment of these ends. Passengers and freight must be transported safely. If passengers are killed or freight lost through the slightest negligence to provide all the means of safety commonly found on first-class roads, the court is morally and legally responsible. An essential and indispensable requisite to the safe and successful operation of the road is the employment of sober, intelligent, experienced, and capable men for that purpose. When a road comes under the management of a court on which the employes are conceded to possess all these qualifications,—and that concession is made in the fullest manner here,—the court will not, upon light or trivial grounds, dispense with their services or reduce their wages; and when the schedule of wages in force at the time the court assumes the management of the road is the result of a mutual agreement between the company and the employes, which has been in force for years, the court will presume the schedule is reasonable and just, and any one disputing that presumption will be required to overthrow it by satisfactory proof.

It is suggested that upon this question the court ought to be governed by the recommendation of a majority of the receivers. The suggestion is without merit in this case, for several reasons: Four of the five receivers are not practical railroad men, and are not familiar with the subject. Two of them are lawyers, residing in New York; one a merchant, residing in Chicago; and one a railroad accountant, having, doubtless, a thorough knowledge of the books of the company, but knowing nothing about the wage schedules. These four gentlemen are eminent in the line of their professions and pursuits, and entirely capable of managing the financial affairs of this great trust, for which purpose they were, doubtless, selected; but their opinions upon the subject of wage schedules are con-

fessedly of little value. The court shares in their anxiety to have an economical administration of this trust, to the end that those who own the property and have liens upon it may get out of it what is fairly their due; but, to accomplish this desirable result, the wages of the men must not be reduced below a reasonable and just compensation for their services. They must be paid fair wages, though no dividends are paid on the stock and no interest paid on the bonds. It is a part of the public history of the country, of which the court will take judicial notice, that for the first $36,000,000 of stock issued this company received less than two cents on the dollar, and that the profit of construction represented by outstanding bonds was $43,929,328.34. These facts are disclosed by the report of the "Commission of the United States Pacific Railway Company" (1887), of which Mr. Anderson, one of the receivers in this case, was a member. See Report, pp. 51, 137. There would seem to be no equity in reducing the wages of the employes below what is reasonable and just, in order to pay dividends on stock and interest on bonds of this character.

The recommendation of the receivers to adopt their schedules cannot be accepted by the court for another reason. That schedule was adopted without affording to the men or their representatives any opportunity to be heard. This was in violation of the agreement existing between the company and the men, by the terms of which no change of the schedules was to be made without notice to the men and granting them a hearing. This was a fundamental error. The receivers should have given notice and invited the men to a conference even if there was no contract requiring it. In answer to this objection to their mode of proceeding, it is said the order of the receivers and the order of the court extended an opportunity to the men to protest against the new schedules after their adoption. The men could have small hopes of a fair and impartial hearing after the receivers had prepared new schedules behind their backs, which were declared by the receivers and the court to be "prima facie just and reasonable." This was very much like first hanging a man, and trying him afterwards. It is small consolation to the victim of the mob to be told he shall have a trial after he is hanged.

It is further said that the receivers had the right to renounce the old schedules and adopt the new ones, because the old ones were mere executory contracts. There are some executory contracts which receivers may renounce, but they cannot claim the benefit of such contracts and at the same time renounce their burdens. This is precisely what was attempted to be done by the receivers in this matter. They renounced the old schedules, and adopted new ones, reducing wages, but seemingly with no idea of absolving the men from the duty of continuing to work and operate the road, for in their petition they ask that their schedules be confirmed by the court, "and all of the said employes directed to conform thereto."

The receivers were the first to break the contract between the court and its employes; but, if the converse had been the case,

the court could not have directed or enjoined the men to continue in its service. Specific performance of a contract to render personal service cannot be enforced by injunction, by pains and penalties, or by any other means. For a breach of such a contract, the only redress the law affords is a civil action for the damages. The court is asked to apply to the employes in its service the principles of the early English statutes, which, by the imposition of heavy pains and penalties, forced laborers to work at fixed wages, and made it an offense to seek to increase them, or to quit the service of their employer. The period of compulsory personal service, save as a punishment for crime, has passed in this country. In this country it is not unlawful for employes to associate, consult, and confer together with a view to maintain or increase their wages, by lawful and peaceful means, any more than it was unlawful for the receivers to counsel and confer together for the purpose of reducing their wages. A corporation is organized capital; it is capital consisting of money and property. Organized labor is organized capital; it is capital consisting of brains and muscle. What it is lawful for one to do it is lawful for the other to do. If it is lawful for the stockholders and officers of a corporation to associate and confer together for the purpose of reducing the wages of its employes, or of devising other means of making their investments profitable, it is equally lawful for organized labor to associate, consult, and confer with a view to maintain or increase wages. Both act from the prompting of enlightened selfishness, and the action of both is lawful when no illegal or criminal means are used or threatened. It is due to the receivers and to the managers of this property to say that they have not questioned the right of the labor organizations to appear and be heard in court in this matter, and that what they have said about these organizations has been in commendation of them and not in disparagement.

Men in all stations and pursuits in life have an undoubted right to join together for resisting oppression, or for mutual assistance, improvement, instruction, and pecuniary aid in time of sickness and distress. Such association commonly takes place between those pursuing the same occupation and possessing the same interests. This is particularly true of men engaged in the mechanical arts, and in all labor pursuits where skill and experience are required. The legality and utility of these organizations can no longer be questioned.

The action of the receivers is objectionable upon another ground. It would be difficult to devise any action better calculated to provoke a "strike." The method of adopting the new schedules was calculated to arouse resentment in the breast of every self-respecting, intelligent, and independent man in the service. While they might have been willing to acquiesce in the reduction of their wages, they were quite sure to revolt against the manner of doing it. Whatever may be the legal right of a railroad corporation to reduce the wages of its employes, or discharge them in a body, without giving them an opportunity to be heard, a court of equity will not act in that manner, or approve the action of its receivers

who have acted in that manner. The receivers, no more than the court, should have undertaken to determine what wages were just and reasonable without giving the men an opportunity to be heard. It is fundamental in the jurisprudence of this country that no court can rightfully make an order or render a judgment affecting the rights of one who is absent and who has had no notice. The requirement that the court or any other tribunal shall hear before it decides is much older than Magna Charta or our constitution. It was written in the Book 3,000 years ago that "he that answereth a matter before he heareth it, it is folly and shame unto him."

A further and conclusive answer to the contention in favor of putting the receivers' schedules in force is found in the fact that Mr. Clark, the only one of the receivers who is a practical railroad man, testifies that they ought not to be put into force without "some modifications." As a result of the old code of rules and schedules, this company has been able to bring into every branch of its service, at reasonable cost, intelligent and capable men, who have carefully guarded and protected its property and business interests, until the train service upon the Union Pacific is to-day equal to that upon any of the great railway systems of the country. Upon the question of the reasonableness of the old schedules we have had no trouble in coming to a satisfactory conclusion. The record shows that all that portion of railroad mileage where excess mileage has been allowed runs through either a mountainous or desert country, where the men engaged in the operation of trains have to contend with heavy grades, and where the winters are long and often severe, and where the hazard of operating is necessarily greatly increased. There is practically no agriculture, and the cost of living is much greater than in an agricultural region. As stated by Mr. Dickinson, "It is a pretty tough place to live." The system of paying excess mileage, Mr. McConnell testifies, has been in vogue ever since the road was built, and was allowed because the company had difficulty in obtaining men who would stay in that region of country. If this system was a good thing for the company when operating the road, it is a good thing for the court when operating the road. As a result of this system, men of intelligence and character have been induced to enter the service, and to establish permanent homes in regions of country where there is practically no business except the business in which they are engaged, and where, for many reasons disclosed by the evidence, it is not desirable to live. A system of rules and regulations by which the company has been able to bring into its service, and retain for 25 years, in some instances, the class of men who have appeared before the court at this hearing, is certainly commendable, and meets the entire approval of the court.

In the opinion of the court, the allowances made by the schedules now in force are just and equitable, when all the conditions are considered. The employes, under the present system, share the burdens of diminished business. They make less mileage and get less pay per month. The rate now paid is not higher than the rate paid on other lines operated through similar country and under

like conditions, and, in the opinion of the court, is not higher than it should be for the service rendered.    The employes, with families to support, are seldom more than a few days' wages in advance of want;  and, if their present wages were materially reduced, they could not live.    The highest and best service cannot be expected from men who are compelled to live in a state of pinch and want.

A court of equity will not pursue a niggardly and cheeseparing policy towards its employes.    Intelligence, bodily vigor, and contentment are wanting among men who are compelled to work for inadequate wages.    Sound public policy, no less than justice to the men, requires that they be paid a rate of wages that will enable them to live decently and comfortably, and school their children. Some corporations may pay their employes a less rate of wages than is here indicated, but a court of equity will not follow their bad example.

It is a gratifying fact that the officers and representatives of the labor organizations of which the men interested in this hearing are members have unanimously assured the court that whatever judgment is rendered in this case will be accepted by the men as a settlement of the dispute, and that in no event, after such a hearing, as has been accorded to them in court, will they strike.    We are confident these assurances will be kept.

When property is in the custody of receivers, the law declares it to be a contempt of the court appointing them for any person to interfere with the property or with the men in their employ. No order of injunction can make such unlawful interference any more of a contempt than the law makes it without such order. Such orders have an injurious tendency, because they tend to create the impression among men that it is not an offense to interfere with property in the possession of receivers, or with the men in their employ, unless they have been specially enjoined from so doing. This is a dangerous delusion.    To the extent that a special injunction can go in this class of cases, the law itself imposes an injunction.    For this reason no order of injunction will be entered in this case.

In conclusion, we may be indulged in giving expression to the hope that, in future differences about wages between courts and their employes, at least,—and we would fain hope between all employers and employes,—resort may be had to reason and not to passion, to the law and not to violence, to the courts and not to a strike.    It is a reproach to our civilization that such differences should result, as they often have, in personal violence, loss of life, destruction of property, loss of wages to the men, and loss of income to the employer, and, when they occur on great lines of railroad, great damage and inconvenience to the public.

An order will be entered in the district of Nebraska continuing the present schedules (subject to the modification as to delayed or overtime) in full force and effect, and setting aside the order made by this court on the 27th day of January, 1894;  also, an order directing the receivers to cause 500 copies of a complete record of this cause, including the pleadings, evidence, opinion,

and orders entered in the several districts, printed and distributed as provided in the order; also an order requiring the receivers to pay the expenses of employes attending the conference ordered by the circuit judges and while attending this hearing.

An order will be entered in the districts of Colorado and Wyoming modifying the orders entered in those districts on the 26th and 27th days of February, 1894, to conform to the order now entered in the district of Nebraska, relating to the rules, regulations, and schedules of pay.

RINER, District Judge, concurs.