## UNITED STATES TRUST CO. OF NEW YORK v. OMAHA & ST. L. RY. CO.

(Circuit Court, S. D. Iowa, W. D. October 11, 1894.)

1. RAILROAD IN RECEIVER'S HANDS—REDUCTION OF WAGES.
   Where a receiver petitions for a reduction of employés' wages. the employés concerned should be notified, and accorded a hearing.

2. SAME.
   Where the wages paid to faithful and competent employés of a railroad in the hands of a receiver are not shown to be excessive for the labor performed, and are not higher than the wages paid to like employés on other lines of similar character, operated under like conditions through the same country, the court will not, against the protest of its said employés, reduce their wages because of inability of the railroad to pay dividends or interest, even though present opportunity exists for securing other employés for less wages.

3. MASTER'S REPORT—HOW FAR CONCLUSIVE.
   The master's conclusions on such petition are of fact, and are not necessarily to be accepted by the court.

This was a suit by the United States Trust Company of New York against the Omaha & St. Louis Railway Company, in which J. F. Barnard was appointed receiver. He thereafter petitioned for the reduction of wages of employés, and the matter was referred to a master in chancery, who recommended such reduction. The matter now comes before the court on exceptions to the master's report.

Theodore Sheldon, for the receiver.
J. J. Halligan, for employés excepting.

WOOLSON, District Judge. The Omaha & St. Louis Railway Company is the owner of a line of railway extending from Council Bluffs, in the state of Iowa, to Pattonsburg, in the state of Missouri, —a distance of 136 miles. This line of road was in former years leased by, and operated as a part of, the Wabash system, but since the year 1887 has been operated by its owners. It is unnecessary, for the purposes of this hearing, to state the changes heretofore had in the ownership of this line. Since the line was taken out of the Wabash system, it has been operated in close connection with that system, under traffic arrangements, and serves as the Council Bluffs extension of that system. On petition duly presented to this court, J. F. Barnard was on June 22, 1893, appointed receiver of this line of road, and yet continues in that capacity. In May, 1894, a petition was presented to this court by the receiver, recommending certain reductions in rates of pay of different classes of employés, and requesting the court to take action thereon. The receiver has also reported to this court his inability, after full attempt had, to agree with said employés on a reduced schedule of wages. The court, accordingly, by its order of July 16, 1894, referred the hearing of the matter to Hon. L. W. Ross, one of the standing masters in chancery of this court, and directed him to take proofs upon said petition of said receiver, and also as to what wages are now being paid on other lines of similar character, operated under like conditions

through the same country, and to report the same, together with his findings thereon, to this court, with all reasonable speed; that he cause to be delivered a copy of this order to each of the employés, so far as practicable, who are to be affected by said proposed reduction of wages; that the receiver furnish transportation, going and returning over his own line, to such of said employés as shall attend before the master in chancery, and that he pay the reasonable and necessary expenses of said employés while attending upon said master; and that all employés of said receiver, so desiring, whose wages are by said petition sought to be reduced, have leave to appear, in person or by attorney or attorneys or other representative, before said master at time and place of hearing, there to offer such proper proof as they may deem fit, bearing upon the matters presented in said receiver's petition. The hearing was had accordingly, commencing July 25, 1894, in which said employés participated, they being also represented by counsel. Evidence was submitted on the part of the receiver and of the employés. The master has filed his report, recommending the reductions asked for by the receiver, and the matter is now before the court on the exceptions filed thereto by said employés. An extended hearing has been given the matter, and counsel for the respective parties have fully presented their views to the court.

Whatever may be the practice in other circuits, that which is to obtain in this circuit has been authoritatively stated. That the practice here obtaining is fair and just to the employés is beyond question. In delivering the opinion of the court in the matter of the proposed rates of pay upon the Union Pacific system (Ames v. Railway Co., 62 Fed. 7), Circuit Judge Caldwell emphatically declares it to be the duty of a receiver to give notice and invite the employés to a conference respecting any proposed reduction of rates of pay. The receiver, in the matter now on hearing, has observed this requirement. And the men have also had full opportunity to present their case, and to urge the same, before the master, to whom the matter was referred, and also to the court. In the opinion to which reference has just been made, Judge Caldwell states at some length "the leading principles which courts of equity keep in view" in matters like the present:

"When a court of equity takes upon itself the conduct and operation of a * * * line of railroad, the men engaged in conducting the business and operating the road become the employés of the court, and are subject to its orders in all matters relating to the discharge of their duties, and entitled to its protection. The first and supreme duty of a court, when it engages in the business of operating a railroad, is to operate it efficiently and safely. No pains and reasonable expense are to be spared in the accomplishment of these ends. Passengers and freight are to be transported safely. If passengers are killed or freight lost through the slightest negligence to provide all the means of safety commonly found on all first-class roads, the court is morally and legally responsible. An essential and indispensable requisite to the safe and successful operation of the road is the employment of sober, intelligent, experienced, and capable men for that purpose. When a road comes under the management of a court, on which the employés are conceded to possess all these qualifications,—and that concession is made in the fullest manner here,—the court will not, upon light or trivial grounds, dispense with their service or reduce their wages."

He further declares, with regard to the commendable desire and duty of the receiver to so administer the affairs of the railway in his hands as to effect the best financial result practicable:

"The court shares in their anxiety to have an economical administration of the trust, to the end that those who own the property, and have liens upon it, may get out of it what is fairly their due. But to accomplish this desirable result the wages of the men must not be reduced below a reasonable and just compensation for their services. They must be paid fair wages, though no dividends are paid on the stock, and no interest on the bonds."

The remarks above quoted have peculiar pertinency when applied to the matter now on hearing. The receiver bears cheerful and hearty testimony to the faithful, intelligent, and capable character and conduct of the men employed on the line of railway under his charge. But his petition and testimony, as well as the master's report, bring out in strong light the greatly lessened net receipts of the road, notwithstanding the highly commendable, and in very many respects successful, attempts of the receiver to reduce the expenditures under his experienced management, and also show his inability to report any funds available for payment of accrued interest on outstanding bonds. We may not overlook the fact that it is desirable, from every standpoint, that this road shall not long remain under the charge of the court. This charge has been temporarily assumed by the court only because the necessities of the situation compelled such a course. And it is the desire and expectation of the court that these necessities be relieved within the earliest time possible, and that the road be turned over, with all speed practicable, to those who may be found entitled to assume its control and management. In determining the questions submitted, therefore, the court will act, not as dealing with a matter which is to remain permanently, or for any considerable length of time, under the order which may be herein entered, but rather with the expectation that the order is to be only temporary in its effect, and subject, as soon as the road can be turned over, to such change as the then owners may desire.

The evidence introduced has largely and naturally been with reference to the rates of pay in operation on those Missouri lines of the Wabash system which connect with, or are divisions or branches of the lines thus connecting with, the railway in receiver's hands. It appears without contradiction that for many years the rates of pay on these Wabash lines and the rates in force on the line in receiver's hands have been the same for like kinds of service; and that in May, 1894, the rates of pay on the Wabash were reduced substantially to the figures now recommended for the employés under the receiver. The argument is strongly presented that since the general traffic on these two lines is closely connected, and is, except as to merely local business on the line, under a joint traffic arrangement, the rates of pay should be the same, and the receiver be authorized to reduce the rates of pay on his line to the Wabash rates as they have been reduced. On the other hand, it is as forcibly urged that the Wabash line is better ballasted, its grades generally less strong, its curves less sharp, and the speed of its trains much greater, and that thereby the Wabash employés are en-

abled to earn a greater mileage in the same number of hours than can be earned by the receiver's employés, engaged in like service, and with less labor correspondingly to the Wabash men, and that, since the receiver has only "Mogul" engines on trains operated by the employés to ·be affected by the proposed reduction, the rates of pay of enginemen and trainmen under the receiver should be greater, because of the more onerous labor performed, than the rates of those on the Wabash system for like services, with trains and engines requiring less onerous service. That the grades on the lines in the receiver's hands are the heavier, and that the Wabash employés are able to earn the greater mileage within a given time, admit of no doubt, under the evidence. The tabulated rates of pay on these two lines, the time-table schedules as presented, showing schedule time between division points on these lines of the several divisions scheduled, and the computations based thereon as to the rate of pay per hour therefor to the various classes of train employés on the rates as now in force on the two roads, all of which have been introduced in evidence, show that the present pay per hour on the receiver's line is much less than the pay per hour to like classes of employés for similar services under the Wabash reduced wages. If it be urged that, under the reduced earnings of the road for the past few months, the present pay becomes disproportionate thereto, the language of Judge Caldwell in the opinion above cited is pertinent,—that "the employés, under the present [mileage] system, share the burden of diminished business. They make less mileage, and get less pay per month."

One of the recognized tests in this matter is that of comparing the rates of pay, as proposed, with those in force upon "other lines operated through similar country, and under like conditions," so far as the same can be done. Unless the Wabash shall be regarded as one of these "other lines" to which reference has just been made, there does not appear to be any line closely meeting these "like conditions." But there are a number of lines in the same general section of country which in many respects are similar in conditions to the receiver's line. The tabulated rates of pay of these lines, which have been separately submitted by counsel upon either side, and which tables are in substantial accord, show that these lines pay rates of wages greater than those proposed for like services in the proposed and reduced schedule submitted by the receiver. At the request of the court, the receiver has furnished, since the hearing before the master, a table showing the amounts paid for each month from April, 1893, to March, 1894, both inclusive, upon the receiver's line, for the different classes of service whose rates are proposed to be reduced; that is, the table contains the amount actually paid by the road for each of these months, for the one year, to different persons engaged during that year on this line of railway. The men selected are a fair illustration, in each line of service, of the wages paid during that time to those so engaged. The table includes nearly all the employés who have testified before the master on the matter of wages. Turning to this table, we find the average of wages to be as follows:

| | Per year. | Per month. |
|---|---|---|
| Passenger engineers | $1,387 57 | $115 63 |
| Passenger firemen | 784 87 | 65 40 |
| Freight engineers | 1,175 68 | 98 72 |
| Freight firemen | 600 92 | 50 08 |
| Freight conductors | 1,097 40 | 91 44 |
| Freight brakemen | 788 19 | 65 70 |

These tables show that the wages received by the several employés in the same line of service are not the same to each employé. The rule in force, of "first in, first out," appears to make such differing wages inevitable. Thus, while one freight brakeman received $926.32 during the year, another received but $700.04 for the same period. And, as to each of these employés, his monthly aggregate of wages varies. Thus, in May, 1893, one brakeman received $120.85, while in the next month he received only $55.56. Another brakeman's maximum monthly wages in that year were $81.38, and his minimum $30.96, during the same year. As partially explaining this inequality, and the low point reached at times in the monthly wages of the same person, it may be stated that the evidence shows that on this line of railway—and the evidence shows the same fact obtains with railways generally—the pay roll carries a larger force than is necessary to man the trains actually run. There must be others besides the men actually engaged and necessary to man the trains as run. Else, in case of sickness or casualty disabling an employé from duty, the train to which he belonged could not be run, unless, by a rare and favorable occurrence, his place could be supplied by some person outside the railroad's employ,—an occurrence so rare, indeed, that no railway manager would hazard the operation of his road by relying thereon. The evidence does not show that these yearly and monthly averages are higher than the rates paid on other lines operated, as nearly as can be found, "through similar country, and under like conditions." And in the opinion of the court the payments shown to have been made by the schedules now in force are just and equitable, and the rate now paid not higher than it should be for the service rendered,—at least, not higher to such an extent as to require the enforced order of this court in the matter; especially under the fact, apparent from the evidence, that the rates, as applied to the greatly reduced volume of business lately passing over this road, will result, of necessity, in greatly reducing payments to these employés.

I do not overlook the testimony introduced on the part of the receiver that the rates, as proposed in the schedule recommended, are fair and just to the men. The witnesses are experienced railroad operators. Their testimony is largely based on the reduced earnings, and the fact that the expenditures of the road for some months have exceeded the receipts; and also on the fact, shown by the evidence, that at the present time many railroad men are unemployed, and seeking employment, so that there would be no present difficulty in engaging others in the place of those who might quit the service because of the reduced pay. The court does not regard these reasons as entitled to much weight in considering the matter to be here decided. The retention of faithful, intelligent, and capa-

ble employés is of greatly more importance than temporary decrease in earnings, or present ability to secure other employés at reduced wages. The court is not justified in discharging trusted, satisfactory employés, or compelling their retirement from the service of the court, because present ability to employ others at reduced wages would turn a present operation at a loss into such operation without loss. If, as has already been determined, the wages now paid are not in excess, in the particulars considered, of the wages paid by other roads running through the same general country, and operating under practically similar conditions, and the wages now paid on this line are not excessive for the services performed, the reasons presented for a reduction, by the court, of those wages (and against the protest of the men affected thereby), should be weighty indeed, and should appeal with most convincing power, before the order for such reduction is entered. The evidence shows that some of the employés, with families to support, are scarcely able to maintain them on present wages. "The highest and best service cannot be expected from men who are compelled to live in a state of pinch and want." The court has examined with care and confidence the testimony of the receiver, and the reports regularly filed by him, which have been introduced in evidence. He appears to have administered his trust with faithful ability and commendable economy. But the court is unable, after such examination, to concur in the reductions proposed.

Nor has the court been unmindful of the general rule obtaining, that the report of the master in chancery is to be accepted, as to facts by him found. The master gave the matter referred to him patient hearing and careful consideration, and the facts found by him appear to be fully warranted by the evidence. Had his conclusions, as based on these facts, been mere conclusions of law, the court might have accepted them as of persuasive force. But such conclusions were not, and under the situation could not be, mere legal conclusions. The question related to the propriety and justice of a reduction of the wages of the employés. The general rule above stated as applicable to the facts presented in a master's report is not here applicable to the ultimate question submitted for decision. And the court has felt, while giving to the master's report large weight in the decision reached, that it must, for itself, decide this question, and record its own judgment.

On the hearing it was conceded by counsel for employés that the rates of pay now in force on the railway in the receiver's hands, for local freight enginemen and trainmen, is larger than the rates in force on the other lines, to which reference has been made above, and with which comparison has been made. The schedules submitted manifest, beyond question, this fact. And, in what has been above written, exception has been intended as to the employés last named. Their rate of pay should be reduced. The court is unable, however, to accept as the proper reduction that which has been recommended for the enginemen, but accepts that which has been recommended for the trainmen. The reduction recommended for local freight engineers is from 5 cents per mile,

the present rate, to 4 cents per mile, and for local freight firemen from 2.7 per mile (present rate) to 2¼ cents per mile. In the judgment of the court, a reduction should be made for local freight engineers to 4½ cents per mile, and for local freight firemen to 2.4 cents per mile. Let an order be drawn overruling the petition, except as to local freight engineers and trainmen, and, as to them, fixing the reduction of pay of such enginemen at 4½ cents per mile, and of such firemen at 2.4 cents per mile, and, as to such trainmen, fixing the reduction at the figures named in the petition; this reduction to become operative from and after November 1, 1894.