DEXTER et al. v. UNION PAC. RY. CO. et al.

(Circuit Court, D. Nebraska. September 21, 1896.)

RAILROAD RECEIVERS—SALARIES OF EMPLOYES—CHANGES OF TRAIN SERVICE.

An order made by the court, adopting a schedule of wages to be paid by the receivers, is not violated by the receivers, in respect to employes receiving monthly wages, by varying the train service to meet changing conditions of traffic, though such change requires somewhat longer hours of service and more miles of service; it appearing that the total service required is not unreasonable in itself, or by comparison with the service on other lines.

E. E. Clark, for complainants.
W. R. Kelly, for defendants.

SANBORN, Circuit Judge. In November, 1895, E. E. Clark and others requested that a hearing be had before this court upon a complaint made by them in a letter to one of the judges of the court that the receivers in this and other cases had violated the order of the circuit court made on April 5, 1894, in the case of Ames v. Railway Co., 62 Fed. 7, which directed them to put and continue in force in that case a certain schedule of wages upon the lines of the Union Pacific Railway Company. The complaint was not that the rate of wages of any of the employes had been reduced or changed by the receivers, but that certain changes had been made in the train service upon the railroad, whereby the conductors upon certain lines of railroad were required to render more hours of service, and to travel a larger number of miles, than they were serving and traveling when the order of the court was made. The court ordered the letter of complaint to stand as an intervening petition, and referred it to the special master to hear, and report his findings of fact and conclusions of law. On June 12, 1896, he reported at length the facts he found, concluded that the complaint was not well founded, and recommended its dismissal.

Three exceptions have been filed to this report. The first is to the conclusions of the master that the order of April 5, 1894, in the Ames Case has not been disregarded by the receivers. A careful consideration of all the testimony before the master has led my mind to the same conclusion. The primary question under consideration in the Ames cause was the amount of the salaries and compensation that should be paid to the employes of the Union Pacific Railway System. After a careful consideration and discussion of that question in the opinion, the court directed a certain schedule of wages to be adopted by the receivers. They adopted it, and have since paid the wages. The evidence before the master disclosed the fact that the earnings of this railway system from passenger business decreased at least 30 per cent. between 1892, when that schedule of wages was originally adopted, and 1895, when this hearing was had. It was not the intention of the court, in adopting the schedule of wages referred to, to prohibit the receivers from making changes in the train service, or from exercising their discretion in the operation of the railroad. They were appointed to

relieve the court from the personal direction and supervision of its operation, and it was their duty to so diminish or increase, to so vary and change, the movement of the trains upon these railroads, that their operation should at all times be as economical, as useful, and as just to all who are interested in the great trust committed to them as they could possibly make it. When the earnings of the road from passenger business had decreased more than 30 per cent., they made some changes in the operation of the trains upon various branches of the system, and discharged some train crews. The general result of these changes was that the service required of the train men on the runs of which complaint was made averaged about 500 miles more per month, and the hours of average daily service were slightly increased; but I think these changes were fully justified by the facts disclosed in the testimony, that they constituted no violation of the order of April 5, 1894, and that they did not require of the conductors any unjust, unreasonable, or excessive service. The special master says, upon this subject:

"In my judgment, the receivers have done nothing that might not be done within the rules and schedules invoked by the complainants. As has been noted, these conductors are all receiving monthly salaries, which are not in any case less than the amount stated in the schedule for the division upon which they work. The claim is that they are performing more than the schedule requirements of work, and, in particular, that they are required to, and do, operate their trains an increased number of miles each month. The schedule of pay submitted with the petition provides two methods of fixing wages of conductors,—one method being that of a given monthly salary, and the other being a given amount for each mile of service. The terms of the schedule, thus fixing a monthly salary in one case, and a mileage compensation in the other, make it clear that the pay of the monthly men is not based upon the mileage made by them, just as it is clear that the mileage men are not entitled to receive monthly pay regardless of their mileage. The conditions of service under the schedule in 1893 conclusively show that the monthly wages were not based upon mileage. It appears that for an average of 4,020 miles the same compensation was paid as for 5,922 miles. It also appears that a conductor running between Ogden and Preston averaged in 1893 a monthly mileage of 5,460, while a conductor running between Ogden and Pocatello averaged only 4,020, and yet these conductors operated in the same district, and on the same rails, for more than half of the run between Ogden and Preston, and they received the same monthly salary. From the uniformity of pay in certain districts, without regard to hours or mileage, the inference is very strong that the pay has been fixed at what has been considered a reasonable compensation for a month's work in the locality where the work was to be performed. This schedule does not specify the number of runs or the mileage to be made by the monthly men. It does provide that they shall receive extra compensation, at regular rates, for service performed on lay-over days, and for delayed time after two hours. It does indicate that the runs shall be arranged upon a fair and equitable basis. The conditions of service in 1893 and since indicate that monthly compensation has never borne a close relation to either mileage or hours of service. It appears that at a certain time certain service was performed, and that at certain times changes have been made in the amount and character of this work. It is a common experience, and has been the experience of these receivers, that changes in the handling of passenger trains must be made. New conditions arise, and must be met. It has happened that, as changes were made, the runs of some passenger conductors were affected, and some crews were no longer needed. It cannot be claimed that when a train was taken off of a division, the whole number of crews should be retained to handle the remaining trains. If not all, then how many? It is conceded by complainants that the schedule did not operate to prevent any and every change in the operation

of trains by the receivers Common sense and common fairness suggest that when a reasonable compensation is paid for a month's work, a fair and reasonable month's work should be performed. I do not find anything in the schedule or in the order of court in conflict with this rule as applied to this petition. The facts in regard to the service are sufficiently stated, and I am forced to the conclusion, from these facts, that the conductors on whose account the complaint is made are not required to perform any more than a fair and reasonable amount of work as monthly employés, nor any more work than it was contemplated that they might be called upon to perform under this schedule. A single illustration is sufficient: The complaint most insisted upon is the present operation of trains between Pocatello and Huntington. There were on this run four trains and seven crews. Two trains were taken off and also three crews. Afterwards the fourth crew was taken off. It was not shown that seven crews were necessary to operate the four trains, but, assuming that they were, it would be apparent that four crews would be more than was needed for two trains. If the work was lighter, as the evidence shows it was, it might be that three crews would be a more fair allotment than four crews. As the facts are, it does not appear that this run is at all burdensome. By choice, the men double the run with only one hour and 50 minutes rest, and then avail themselves of 49 hours rest."

I concur in the conclusion of the master and the reasons upon which he bases this conclusion, so well expressed in the above quotation.

The second exception is to the fact that the master does not, in his report, refer to the fact that the conductors on the divisions of the Union Pacific System involved in this controversy are required to perform much more service than is required of conductors on connecting and competing lines. No doubt the compensation received by employés upon competing lines, rendering similar service, may well be considered by the court in determining the service that ought to be required of the employés of this system. I have carefully read all the testimony presented to the master upon this subject, and am still unable to persuade myself that the receivers have required either unreasonable, unjust, or excessive service of any of the complainants in this case.

The third and the only other exception to the report of the master is to his statement that the complaint most insisted upon is the present operation of the trains between Pocatello and Huntington. It is, however, not material upon which complaint the most reliance is placed, if no one of them is well founded.

The exceptions must be overruled.