Argued and submitted October 6, 2010, on appeal, reversed and remanded for reconsideration of severance damages and attorney fees; otherwise affirmed; on cross-appeal, reversed and remanded to reconsider post-judgment interest; otherwise affirmed April 6, 2011

CITY OF BEND,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

JUNIPER UTILITY COMPANY,
an Oregon corporation;
J. L. Ward Company,
an Oregon corporation;
and Jan L. Ward,
*Defendants-Respondents*
*Cross-Appellants,*

*and*

JUNIPER WATER COMPANY,
an Oregon nonprofit corporation;
Homeowners of Tillicum Village,
an Oregon nonprofit corporation;
Homeowners of Nottingham Square Association,
an Oregon nonprofit corporation;
Timber Ridge Homeowners Association,
an Oregon nonprofit corporation;
Frederick W. Rusch, II;
Paul B. Brewer and Donna M. Brewer,
Trustees of Brewer Family Trust;
Richard R. Reynolds and Joann J. Reynolds,
Trustees of Reynolds 1991 Revocable Living Trust;
Alfred J. Caputo;
Gordon Westergard and Sharon K. Westergard,
dba The Pines Mobile Home Park;
Jo Ann L. Gamette,
Trustee of the Jo Ann L. Gamette Living Trust;
Dennis Beltrame,
trustee;
Margaret Beltrame,
trustee;
Larry Beser,
dba Quail Ridge Mobile Home Park;

Kim D. Ward, LLC,
dba Crown Villa RV Park,
an Oregon limited liability company;
Ward Investment Properties, Inc.,
an Oregon corporation;
Kim D. Ward;
Mountain High Homeowners Association,
an Oregon nonprofit corporation;
River Place MHC,
a California limited partnership,
*Defendants.*

Deschutes County Circuit Court
02CV0202ST; A137087

252 P3d 341

John W. Stephens argued the cause for appellant - cross-respondent. With him on the briefs was Esler Stephens & Buckley.

Gregory R. Mowe argued the cause for respondents - cross-appellants. With him on the briefs were William F. Buchanan, Brad S. Daniels, and Stoel Rives LLP. On the reply brief was James N. Westwood.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Nearly a decade ago, the City of Bend determined that a water and sewer utility, Juniper Utility Company, was not meeting the needs of its customers, so the city filed a condemnation action to take ownership of the utility for public use. The central question at trial was the proper method for determining the fair market value of the utility plant. The trial court applied what is known as the "cost approach" in determining that the fair market value of the plant was approximately $3.3 million. The city appeals, arguing that the court erred in applying the cost approach and that, under the proper test—the "income approach"—the fair market value was actually far less, because the plant had virtually no potential to generate income and, for that reason, no buyer would pay anything for it. Juniper Utility Company and other defendants in the case (collectively "the Utility Defendants") cross-appeal, arguing that the award of just compensation was in fact too low, and that they were entitled to additional compensation for certain easements as well as further post-judgment interest. For the reasons that follow, we affirm the judgment with respect to the trial court's valuation of the utility plant, reverse with respect to the award of certain severance damages, and remand.

## I. BACKGROUND

We take the relevant facts from the trial court's explicit and implicit factual findings, which are supported by evidence in the record. ORCP 62 F ("In an action tried without a jury, * * * the findings of the court upon the facts shall have the same force and effect, and be equally conclusive, as the verdict of a jury.").[1] To the extent that the parties dispute the particulars or importance of various factual findings, we address those issues in greater detail in later sections of this opinion.

In the 1960s, the Ward brothers began developing various properties in the Bend area. In 1972, two of the brothers, Jan and Kim, incorporated Juniper Utility Company to provide water and sewer services to support the

---

[1] Our review of the complicated factual and legal issues in this case was significantly aided by the trial court's thorough and thoughtful opinion.

family's development projects. Over the years, the Juniper Utility Company system[2] evolved into what is now a unique combination of water delivery facilities with a sewage disposal and treatment system. The water delivery facilities include a two-pipe system, one pipe that delivers potable water and another that provides irrigation water. The two-pipe system serves approximately 1,125 customers in southeastern Bend and supplies them with nonpotable irrigation water at an affordable price, thereby allowing them to keep their neighborhoods lush throughout the summer. The sewage collection system, meanwhile, is pressurized by pump stations at customer residences; waste is pumped to a treatment plant for processing, and effluent from the plant is then pumped through pipes and disposed of on land owned by J. L. Ward Company, the successor to the various Ward businesses.

Much of the dispute in this case stems from the fact that Juniper Utility Company was never intended to be an independent profit source for its owners. Rather, from its inception, the Wards viewed it as a project that would support their other profit-making development ventures. Once the utility company was incorporated, various Ward family entities and individuals transferred ownership of an existing treatment plant, water reservoir, and certain pump and well sites to Juniper Utility Company, as well as certain "blanket easements"—*i.e.*, easements to use their land for installation and maintenance of utilities, and to use and maintain certain "ponds." The utility company, meanwhile, agreed to provide water and sewer services to properties owned by the grantors "on a non-profit basis."

In addition to those capital contributions—known in utility terminology as "contributions in aid of construction"—the Ward family and its entities also bore the initial cost of expanding the utility infrastructure. When a parcel of land was developed, J. L. Ward Company[3] would subdivide the

---

[2] For convenience, we refer to the utility system as the "Juniper Utility Company system" or the "Juniper system," recognizing, as did the trial court, that other persons or entities may own or have a legal interest in parts of the system.

[3] Jan and Kim were two of four brothers who owned development companies. In 1974, Jan bought out his brothers and is the majority shareholder of J. L. Ward Company, the successor to the other development companies.

land and then build the utility infrastructure in the common areas or, in some cases, on land dedicated to the public. Juniper Utility Company was then given an easement for its pipes and other facilities. As lots or homes were sold in the development, J. L. Ward Company recouped the cost of the infrastructure as part of the sales price. The utility entered into a series of operating agreements with homeowners associations (HOAs) and with Kim Ward (who developed mobile home and RV parks) that provided that rates would be set at a level necessary to operate and maintain the utilities but that "[n]o accumulations for profit shall be made."[4]

For more than two decades, Juniper Utility Company set its own rates for water and wastewater services. In 1998, however, the Oregon Public Utility Commission (PUC) asserted regulatory authority over Juniper Utility Company and held ratemaking proceedings. *See* ORS 757.061 (describing water utilities subject to financial regulation). In 2000, the PUC entered an order determining "fair, just, and reasonable rates" for Juniper Utility Company's services; those rates were substantially lower than the rates that Juniper Utility Company had been charging its customers.

The way in which Juniper Utility Company was created and operated had a significant effect on the rates set by the PUC. As a general matter, the ratemaking process is intended to provide utilities an opportunity to earn a fair and reasonable return on their investment. Property that the utility receives as a contribution in aid of construction— "CIAC" for short—is not considered part of the utility's investment and is therefore given a value of zero for purposes of calculating the utility's rate base, which is the amount of investment on which a regulated public utility can earn a fair and reasonable return. In setting rates for Juniper Utility Company, the PUC determined that developer contributions—that is, capital contributions from J. L. Ward Company and others to create and expand the utility—were CIAC and would therefore not be considered in calculating a

---

[4] Jan later formed Juniper Water Company, a nonprofit corporation, to own the distribution, storage, and source water assets in certain developed areas within the Juniper system.

reasonable return on investment. As a result, the PUC determined that the total rate base for the utility was less than $100,000. The PUC authorized a 10 percent rate of return, the PUC's generic rate for water utilities, thereby allowing Juniper Utility Company to earn a return of less than $10,000 per year from its rate base.

After its rates were set at that reduced level, J. L. Ward Company, which had paid for necessary maintenance of Juniper Utility Company, stopped supporting the utility. Capital improvements and maintenance were deferred; service was curtailed and became inadequate in many respects. Customers responded with complaints about the utility to the PUC and to the City of Bend. Thereafter, the PUC and the city sought and obtained injunctive relief requiring Juniper Utility Company to provide adequate service. In September 2001, the Bend City Council adopted a resolution of necessity and intent to appropriate the Juniper system property. The city initiated this condemnation action in April 2002. *See* ORS 225.020(1)(a) (authorizing a city to bring an action for condemnation to "[a]cquire water systems and use, sell and dispose of its water for domestic, recreational, industrial, and public use and for irrigation and other purposes within and without its boundaries").

The city's condemnation complaint sought to take various Juniper system assets for public use, including pipes, valves, pumps, wells, headgates, hydrants, a wastewater treatment facility, sewer lift stations, and other infrastructure, as well as water rights, real property, and utility easements. During the course of the litigation, the most hotly contested issue was the method of valuation to be used to determine the fair market value that the city should be required to pay for the "utility plant"—that is, "all pipes, valves, pumps, wells, treatment facilities and other infrastructure."

As later discussed in greater detail, there are three commonly utilized methodologies for appraising the value of plants like the Juniper system: (1) the market approach, which looks at comparable sales data; (2) the income approach, which looks at the income-generating potential of the property; and (3) the cost approach, a valuation typically

based on replacement or reproduction cost of the plant minus any depreciation. *See generally* Appraisal Institute, *The Appraisal of Real Estate* (12th ed 2001). The parties agreed that the market approach was unhelpful in this case, because there were no comparable sales of plants like the Juniper system. The city therefore urged the court to apply the income approach, which would have valued the plant based on its potential to generate income to a willing buyer. Under that approach, the city contended, the plant had a fair market value of zero; thanks to the utility's rate base, which did not account for CIAC, the regulated plant was essentially worthless because it could generate only a negligible return.

The Utility Defendants, meanwhile, argued that the plant's regulated income potential—admittedly nothing—failed to capture the fair market value of the utility. The better approach, in their view, was the cost approach. That approach, according to the Utility Defendants, would account for the fact that CIAC, though not counted for purposes of *ratemaking*, nevertheless is valuable property that cannot be taken without just compensation.

The trial court, in an extensive written opinion, agreed with the Utility Defendants that the cost approach provided the best indicator of the plant's fair market value. The court explained that it is "not a novel concept in eminent domain law * * * that the condemning authority must pay fair market value, regardless of how the condemnee came to own the taken property." Accordingly, the "intrinsic value" of the plant "does not disappear because of the decision by J. L. Ward Company to contribute the assets, rather than loan Juniper Utility Company the money to buy the assets. A taking of the Juniper Utility Company assets for no compensation [as the city proposed] would be little more than a confiscation." The court continued,

> "Nor does the difficulty in valuing a special use asset work to deprive it of value. Certainly, Juniper Utility Company is a unique, special purpose property. As a result, there is no ability to value it using the market approach as there are no comparable sales. The income approach fails to value the taken property at all. In this situation, it is black letter law that the cost approach may be considered."

Although the court concluded that "[t]he cost approach is the only method of valuation appropriate in this case," it nevertheless declined to accept the Utility Defendants' appraisal "lock, stock and barrel." Rather, the court concluded that the starting point for determining fair market value of the plant was "original cost new less depreciation," which, according to the court, would take into account the age and condition of the plant and the regulatory environment (including the fact that even an unregulated buyer would not pay more for the plant than the original cost of the plant less depreciation). In the end, the court found "the fair market value of the Juniper Utility Co. plant to be $3,297,859." The court separately valued water rights ($347,590), easements ($1,515,883), and real property taken in fee ($326,400). As relevant here, in valuing the easements, the court concluded that certain "blanket easements"—those easements that had been granted to Juniper Utility Company to facilitate access to the utility infrastructure—were typically granted to utility providers at no cost and should therefore not increase the compensation award.[5] The court also awarded the Utility Defendants damages for impairment to their remaining property that was caused by the condemnation of the utility. The court then entered a judgment of condemnation that included prejudgment but not post-judgment interest as part of the calculation of just compensation. The city appeals, and the Utility Defendants cross-appeal.[6]

## II.   ANALYSIS

### A.   *The Law of Eminent Domain*

■　　　A quick primer on the law of eminent domain is helpful to set the stage for the parties' various assignments of error. Under Article I, section 18, of the Oregon Constitution,

---

[5] The court's valuation of water rights, easements, and real property taken in fee is not challenged by the parties, except to the extent that the Utility Defendants disagree with the court's valuation of certain blanket easements, one of the subjects of the cross-appeal.

[6] Before entering the judgment, the court held further proceedings on the apportionment of compensation among the various defendants that had interests in the Juniper system. That aspect of the court's judgment is not relevant to the issues on appeal or cross-appeal.

"Private property shall not be taken for public use * * * without just compensation[.]" Private property is "taken" for public use through the exercise of the power of eminent domain—that is, " 'the power inherent in a sovereign state of taking or of authorizing the taking of any property within its jurisdiction for a public use or benefit.' " *Dept. of Trans. v. Lundberg*, 312 Or 568, 571 n 1, 825 P2d 641, *cert den*, 506 US 975 (1992) (quoting *MacVeagh v. Multnomah County*, 126 Or 417, 431-32, 270 P 502 (1928)). Governmental units with eminent domain authority, such as the City of Bend, can exercise that authority by instituting condemnation proceedings. *See* ORS chapter 35 (governing condemnation proceedings).

██ ██    If the condemner and the property owner cannot agree on "just compensation," the issue is tried to the jury or a court. *See* ORS 35.305(2) ("Condemner and defendant may offer evidence of just compensation, but neither party shall have the burden of proof of just compensation."). Under Oregon law, "just compensation" is determined based on the fair market value of the property that is being taken. Fair market value, in turn, is "defined as the amount of money the property would bring if it were offered for sale by one who desired, but was not obliged, to sell and was purchased by one who was willing, but not obliged, to buy." *Lundberg*, 312 Or at 574. In other words, "just compensation" is the amount that a willing buyer would pay a willing seller for the condemned property.

B.   *The Appeal*

The difficulty, of course, is how to figure out what a willing buyer would pay a willing seller for a public utility like the Juniper plant—a water and sewage system for which there is no established market.[7] That is the primary issue on appeal, as it has been throughout this litigation: In the

---

[7] The trial court explained:

"There is no established market for the sale of water or waste water utilities in Oregon or in Washington. The appraisers have identified no sales of a combined water and waste water utility. There are no sales of a two pipe water utility. There are no sales of private utilities of the size of Juniper Utility Company. There are simply no comparable sales. Sales that have occurred do not establish any pattern or customary ratio between sale price per customer or sale price as a function of rate base. There is no evidence of fair market value based upon the market approach."

absence of comparable sales, what is the proper methodology for determining the fair market value of the Juniper system? The city argues that the method utilized by the trial court, the cost approach, was erroneous as a matter of law:

> "The trial court erred as a matter of law when it used the cost method to determine the fair market value (just compensation) of property that its owner(s) devoted to a public purpose and that was necessary or useful to provide water and wastewater utility service—particularly where the market value of that property was capable of being established by the income method."

The parties, as an initial matter, disagree about the proper standard of review with respect to the trial court's use of the cost approach. The city argues that "[w]hat approach, method, or theory a court should properly use to determine the fair market value of property is a matter of law for the court, and the Court of Appeals reviews the trial court's decision for errors of law." The Utility Defendants, meanwhile, submit that the "trial court's choice of valuation methodology and most of the other decisions that the City challenges are questions of fact reviewed under the any evidence standard of review."

■　Fair market value in condemnation cases is ultimately a question of fact. *See Lundberg*, 312 Or at 574-75 ("The question of the highest and best use of particular property is not a question of constitutional magnitude or of law, but is a question of fact that relates to the question of value and is to be decided by a jury."); *Selbee v. Multnomah County*, 247 Or 390, 394, 430 P2d 561 (1967) ("In order to *enable the jury to pass intelligently upon the question of whether the market value of the remaining land has been increased* as a result of the improvement, we think that, at least in the generality of cases, there must be some evidence of that fact other than the improvement itself." (Emphasis added.)).[8] At the same time, courts have always served an important role in cabining the "just compensation" inquiry—*i.e.*, in applying limits on what a trier of fact can consider when determining

---

[8] To the extent that the matter of just compensation is one of fact entrusted to a jury, or to a court in lieu of a jury, we review for any evidence to support the verdict. ORS 19.415(1); ORCP 62 F.

fair market value. *See, e.g., Santiam Lumber Co. v. Conhaim*, 218 Or 220, 224, 344 P2d 247 (1959) ("We think that in a condemnation proceeding to acquire an easement for a logging road right of way, evidence of the quantity of timber that might be transported over the right of way is not a proper factor to be considered by the jury in determining the fair market value of the land being condemned.").

Neither the Supreme Court nor this court has ever addressed exactly where valuation methodology falls on the continuum between questions of fact and questions of law in eminent domain cases. However, in tax cases—cases involving public utilities, no less—the Supreme Court has repeatedly observed that, when determining fair market value, the choice among particular valuation methods is generally a fact-based inquiry rather than a question of law. *See, e.g., United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 431, 770 P2d 43 (1989) ("[W]hen this court evaluates and then either accepts or rejects various theories of valuation offered by the parties, it almost always does so as a finder of fact on *de novo* review of the record made in the Tax Court."); *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979) ("[W]hether in any given assessment one [valuation] approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record."); *Brooks Resources Corp. v. Dept. of Revenue*, 286 Or 499, 503, 595 P2d 1358 (1979) (reviewing as a fact question the choice among "three standard approaches to valuation: the market data approach, the income approach, and the cost approach").

The court's discussion of valuation methodologies in *Brooks Resources Corp.* is particularly illuminating:

"We have observed in previous cases of this kind that there are three standard approaches to valuation: the market data approach, the income approach, and the cost approach. *Bend Millwork v. Dept. of Revenue*, 285 Or 577, 592 P2d 986 (1979); *Medical Building Land Company v. Dept. of Rev.*, 283 Or 69, 582 P2d 416 (1978); *Swenson v. Dept. of Revenue*, 276 Or 1, 553 P2d 351 (1976). The appropriateness of a particular valuation method or combination of methods is not determined by fixed principles of law, but

is a factual determination that depends on the record developed in each case. *See Medical Building Land Company v. Dept. of Rev., supra* at 78-79. Because we try this case 'anew upon the record,' we must determine which of the above approaches to valuation, under the facts of this case, best reflects the 'true cash value' of the property. In making this determination, we emphasize that we are performing our function as fact-finder, not our function as a corrector of legal errors."

286 Or at 503-04 (footnote omitted).

The tax context differs, of course, from condemnation in many ways, but the basic premise of *Brooks Resources Corp.* carries over to any context in which a factfinder is charged with determining fair market value, be it a conversion case, a tax case, or a condemnation case. That is, unless some fixed principle of the law demands otherwise, it is left to the trier of fact to assess the evidence, including expert testimony regarding the appropriateness of a particular valuation methodology, and to then make a factual call as to the fair market value of the property in question.

Viewed through that prism, we understand the city's first assignment of error to present a rather narrow legal question: whether some fixed principle of eminent domain law prohibited the trial court from considering the cost approach as part of its factual determination of fair market value. If so, the trial court committed reversible error in relying on that evidence as it did; in the absence of such a fixed principle, however, we will not second-guess the trial court's decision to give weight to a particular valuation approach in finding a fair market value for the Juniper system.[9]

---

[9] The Utility Defendants suggest that, because the city does not assign error to the court's ruling on the admissibility of evidence regarding the cost approach, our review is for "any evidence" to support the court's election. *See Highway Commission v. Dumas*, 238 Or 449, 454, 395 P2d 424 (1964) ("The rule approved by the courts is that when cross-examination develops that the opinion of a witness as to the value of property is based wholly, or in substantial part, on improper or illegal elements, a motion to strike out the testimony of the witness as to value will lie * * *."). Although the issue might have been presented more cleanly on appeal had the city assigned error to the earlier evidentiary rulings, the trial court plainly understood the central issue in the case to be whether the cost approach was a legally permissible valuation methodology, and we therefore address the city's argument that the court erred as a matter of law in considering the cost approach. *Cf. State Highway Com. v. Vella*, 213 Or 386, 395-96, 323 P2d 941 (1958) (court

The city offers several interrelated reasons as to why the cost approach was, as a matter of law, an impermissible valuation methodology in this case. The contentions, as we understand them, boil down to the following: (1) The cost approach is evidence of the *maximum* amount that a willing buyer might pay, not a measure of fair market value in itself; for that reason, Oregon courts have approved the use of the cost approach only as a ceiling when other valuation methods yield a higher fair market value. (2) The appropriate measure of fair market value for a public utility like the Juniper system is, as a matter of law, the income approach, not the cost approach. We are not persuaded by those contentions.

The city's primary argument is that the cost approach, standing alone, never yields a fair market value for purposes of eminent domain. That is so, the city argues, because "[t]he cost approach, unlike the market approach and the income approach, has no external reference to the market." According to the city, "[t]he cost approach is based on the principle of 'substitution,' that a willing buyer would not pay *more* for a property than the cost of constructing a comparable facility." For that reason, the argument goes, "Oregon courts have consistently held that the cost approach is not an appropriate way to value property in an eminent domain action."[10]

After canvassing the authority cited by the city, we are not persuaded that the cost approach serves such a limited role in assessing fair market value, particularly in a condemnation case like this. The underpinnings and application

_____

committed reversible error in instructing the jury regarding proper consideration of evidence of business losses in determining fair market value; "We do not think that the erroneous reception of such evidence, even though without objection, authorizes a court to change established rules of law fixing the measure of recovery in a condemnation proceeding.").

[10] The Utility Defendants' experts calculated present reproduction costs and then used an indexing method to determine original cost—a lower figure than present reproduction costs. In employing the cost approach, the court used original cost less depreciation as opposed to present reproduction cost less depreciation. At times, the city refers in its first assignment to the trial court's error in using "original cost" to value the plant, but we do not understand the assignment to challenge the use of "original" as opposed to "reproduction" costs. That is, we understand the city to argue that the court should have used the income approach rather than the cost approach, as opposed to arguing that the court erred in using original rather than reproduction costs (which actually resulted in a lower fair market value, thereby benefitting the city).

of the cost approach have long been the subject of scholarly debate. In his treatise on the appraisal of property, Professor Bonbright explains that the principle of substitution "merely justifies the inference that * * * property cannot be worth *more* than its replacement cost," but that "[i]t by no means warrants the further inference that the value is as high as this, or even that the value is nearer to replacement cost than it is to zero"—a point that "the American courts have often failed to recognize[.]" James C. Bonbright, I *Valuation of Property* 159 (1st ed 1937). "Nevertheless," Bonbright continues, "under certain circumstances an appraiser is warranted in accepting an estimate that the replacement cost of property, with proper allowance for incidental loss and for depreciation, *as the best available measure of its value.*" *Id.* (emphasis added). One of those circumstances, he later explains, is in eminent domain cases: "Estimates of current replacement cost minus arbitrary deductions for depreciation must often be accepted in default of a better measure." *Id.* at 420-21. Modern authorities likewise have taken the view that the cost approach, in addition to establishing an upper limit to fair market value, can itself be an acceptable indicator of fair market value in some cases:

> "Buyers of these [special-purpose or specialty properties not frequently exchanged in the market] often measure the price they will pay for an existing building against the cost to build minus depreciation or the cost to purchase an existing structure and make any necessary modifications. If comparable sales are not available, they cannot be analyzed to develop an opinion of the market value of such properties. Therefore, current market indications of depreciated cost or the costs to acquire and refurbish an existing building are the best reflections of market thinking and, thus, of market value * * *."

*The Appraisal of Real Estate* at 354; *accord Delta Air Lines, Inc. v. Dept. of Rev.*, 328 Or 596, 605, 984 P2d 836 (1999) ("The cost approach to value is based upon the principle of substitution, that is, *it assumes that property is worth its cost or the cost of a satisfactory substitute with equal utility.*" (Emphasis added.)).[11]

---

[11] Although *Delta Air Lines, Inc.,* is a tax case, there is no reason to think that the appraisal methodology applies differently in condemnation cases.

Indeed, Oregon courts have specifically recognized—if not endorsed—the cost approach as an appropriate valuation methodology in condemnation cases involving special use property for which comparable sales data is unavailable. In *Highway Comm. v. Superbilt Mfg. Co.*, 204 Or 393, 419-20, 281 P2d 707 (1955), the court, quoting a leading treatise on the subject of eminent domain, stated:

> "Peculiar circumstances warranting a resort to other considerations than the usual tests for determining market value are set forth in 4 Nichols, Eminent Domain 133, § 12.32, as follows:
>
> " 'It occasionally happens that a parcel of real estate taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, if he desired to dispose of it he would be unable to sell it at anything like its real value. A church, or a college building, or a clubhouse located in a town in which there was but one religious society, or college, or club, might be worth all it cost to its owners, but it would be absolutely unmarketable. * * *. Even such a piece of property as a mill site or a reservoir site, or a factory or store of abnormal size may, to a somewhat lesser degree, be difficult to dispose of, though of great value to its owner.
>
> " 'In such a case as similar property is not commonly bought and sold it is impossible to ascertain market value by the usual tests. In fact, as market value presupposes a willing buyer, the conditions upon which such value is based are not present, and it is sometimes said that in cases of this character market value is not the measure of compensation. As it is conceded that the owner cannot on that account be deprived of his property without any compensation whatever, some other measure is sought. It must, however, be remembered that market value is always based upon hypothetical conditions, and that it is never necessary to show that there was in fact a person able and willing to buy. *The measure is still what another religious society, or college, or club, or public service corporation, or abutting owner, would pay if there were one at hand; in other words, the measure is still market value. However, since the usual means of ascertaining market value are lacking, other means must from the necessity of the case be resorted to.*

*It is, therefore, proper in such cases to deduce market value from the intrinsic value of the property, and its value to its owners for their special purposes. * * *.'"*

(Emphasis added.)

The cost approach is one of the "other means" for deducing the fair market value of special use property in eminent domain cases. In *Bd. Higher Ed. v. 1st Meth., Ashland*, 6 Or App 492, 494, 488 P2d 835 (1971), we explained:

"Market value is the recognized measure of compensation when land is taken by eminent domain. *Highway Comm. v. Superbilt Mfg. Company*, 204 Or 393, 281 P2d 707 (1955); 4 Nichols', Eminent Domain 41, § 12.2 (1962). Other criteria are recognized, though, in special circumstances. One is the 'replacement facility' theory, described in 4 Nichols', § 12.32 at 227:

" 'Where a building is a specialty, and, in a sense, unique, being constructed for a special use, the valuation cannot be predicated on the same basis as a building constructed for general * * * use. * * * It has been held under such circumstances that reproduction cost or replacement cost may be considered * * *.' "[12]

*See also* Julius L. Sackman, 4 *Nichols on Eminent Domain*, § 12C.01[3][b] (rev 2001) (citing cases that have approved the use of the cost method for special use property); S.W. Moore, 8 *Nichols on Eminent Domain* § G14A.06 (rev 2008) ("The three basic approaches to value are: (1) Market, (2) Cost, and (3) Income. All three may apply to public-utility valuation, with modifications."); *cf. State Hwy. Comm. v. Demarest*, 263 Or 590, 607 n 2, 503 P2d 682 (1972) ("Often market value of trade fixtures, based on comparable sales, is difficult to determine in cases where the trade fixtures are being evaluated separately in condemnation cases. *In such circumstances,*

---

[12] In *1st Meth., Ashland*, we concluded that the jury was improperly instructed regarding consideration of the "replacement cost" of the condemned property because it was not special use property. 6 Or App at 495 ("We see no 'speciality' in the physical makeup of the youth center that renders market value inapplicable as a measure of compensation."). After concluding that the property was not "special use," we discussed additional limitations on the cost approach that are not helpful to our analysis of this assignment of error but that are relevant to our later discussion of the city's sixth assignment of error.

*other approaches, such as reproduction or replacement costs less depreciation, are used."* (Emphasis added.)).

Accordingly, we are not persuaded by the city's contention that Oregon courts have categorically rejected the use of the cost approach by a trier of fact as part of the ultimate determination of fair market value. The question whether the trier of fact may permissibly consider that approach in determining fair market value has been determined by Oregon courts on the facts of each case, as it has been in other jurisdictions. *See, e.g., Dade County v. General Waterworks Corp.*, 267 So 2d 633, 641 (Fla 1972) (describing use of "reproduction cost method" in valuing utilities for condemnation purposes); *The Appraisal of Real Estate* at 354 ("The cost approach is also used to develop an opinion of market value * * * [of] special-purpose or specialty properties, and other properties that are not frequently exchanged in the market."); *accord Appeal of Pennichuck Water Works, Inc.*, 160 NH 18, 38, 992 A2d 740, 757 (NH 2010) ("The trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base or net book), comparable sales, cost of alternate facilities, capitalized earnings, and reproduction cost less depreciation. * * * We have * * * never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." (Internal citations and quotation marks omitted.)).[13]

The city offers a fallback argument in the event this court disagrees, as we do, with its categorical rejection of the cost approach. The city seizes on language in *Superbilt Mfg. Co.* in which the court held, "[I]nasmuch as the property being appropriated had a market value that could be determined by the usual tests, it was error to admit evidence respecting reproduction costs * * *." 204 Or at 426. From that

---

[13] Moreover, we note that the cost approach has long served as an accepted method for determining fair market value in tax cases, including the fair market value of public utilities. *See, e.g., Shields v. Dept. of Rev.*, 266 Or 461, 464-66, 513 P2d 784 (1973) (where no comparable sales for regional shopping center were available, and income and expenses of shopping center had not stabilized, cost approach was the proper method of determining property's fair market value); *PP&L v. Dept. of Rev.*, 308 Or 49, 775 P2d 303 (1989) (deriving fair market value of utility from cost approach and income approach). We see no reason why a different rule would apply in this context, given the unique nature of the Juniper system.

holding, the city posits that resort to the cost approach was likewise legal error in this case because the market value of the Juniper system was capable of being established by the income approach. That argument has two premises: (1) that "the usual tests" include the income approach; and (2) that the fair market value of the Juniper system was capable of being established by the income approach. Neither premise is correct.

The reference to "the usual tests" for valuation in *Superbilt Mfg. Co.* is to the type of measures of value that are possible for property that is regularly bought and sold—in other words, the market approach. The opinion earlier discusses "the usual tests" in that context: " 'In such a case as similar property is not commonly bought and sold it is impossible to ascertain market value by the usual tests.' " *Id.* at 419 (quoting 4 *Nichols on Eminent Domain* 133, § 12.32). And, on the facts in *Superbilt Mfg. Co.*, that was indeed the case—the property at issue was an empty warehouse, and the court observed that "[t]here is no question that empty warehouse buildings of the type and construction of the building involved in this litigation have a market value in the city of Portland and vicinity, and that such market value may easily be established in the usual manner." *Id.* at 427. Thus, we are not persuaded that the income approach, at least in the context of a regulated utility, is one of "the usual tests" that can foreclose use of the cost approach.

Moreover, as the trial court cogently explained, the city's income approach has significant limitations when applied to a regulated utility; most notably, it fails to account for the Juniper system's value to nonregulated buyers and does not compensate the utility for CIAC—contributions by J. L. Ward Company and others in aid of the construction and expansion of the utility. Under state utility regulations, Juniper Utility Company was allowed to recoup a reasonable return on its investment. That investment, for ratemaking purposes, did not include property contributed to the utility. OAR 860-037-0567 (CIAC excluded from rates). As a result, the system had little income-producing potential as a regulated utility. And in the city's view, that income-producing potential—or lack thereof—is, as a matter of law, the only indicator of the utility's fair market value: No hypothetical

buyer would pay *anything* for property that cannot produce income. There are two significant problems with the city's argument, either of which is fatal to its view that the value of the Juniper system was capable of being established by the city's proffered income approach.

First, the city's approach did not allow for the utility's income-producing potential to nonregulated buyers. As the trial court aptly pointed out, "[u]nregulated entities can be created for the purpose of buying a utility, such as a peoples utility district or a co-op." Those unregulated buyers would not be subject to the same rate restrictions as a regulated buyer and could potentially operate the utility at a greater profit. *See* ORS 757.005(1)(b) (exempting "[a]ny plant owned or operated by a municipality" from the definition of "public utility"); ORS 756.010 ("municipality" includes quasimunicipal corporations). For that reason, too, the trial court was not required to accept the city's regulated income approach. *Cf. Appeal of Pennichuck Waterworks, Inc.*, 160 NH at 41, 992 A2d at 760 ("[I]t is error not to consider a potential unregulated municipal buyer when valuing a water utility. * * * Even if such a purchase is unlikely, * * * it must be considered. * * * The unlikelihood of sale is, after all, the reason why valuation of public utilities is so extraordinarily difficult and why this court has typically given the trier of fact considerable deference in this area." (Internal citations and quotations omitted.)).

Second, the city's approach effectively equates the utility's value for ratemaking purposes with its fair market value for purposes of just compensation. As the trial court correctly observed, courts have rejected that approach given the differences between ratemaking and condemnation proceedings. *See, e.g., Dade County*, 267 So 2d at 639 (constitutional requirement that property owner receive "full compensation" requires "that the method of valuation which is utilized take into consideration the value of the contributed property"). In fact, the city concedes that it is unable to cite a single case in which the income approach alone was employed as the valuation methodology for an unprofitable public utility. *See Moriarty Bd. of Educ. v. Thunder Mtn. Water*, 141 NM 824, 161 P3d 869 (2007) (rejecting regulated income valuation approach); *Dedeaux Utility Company v.*

*City of Gulfport*, 938 So 2d 838 (Miss 2006) (same); *WSSC v. Utilities, Inc.*, 365 Md 1, 775 A2d 1178 (2001) (same); *Rangeley Water Company v. Rangeley Water Dist.*, 691 A2d 171 (Me 1997) (same). To hold otherwise would be to allow the government to confiscate public utility systems that produce little income; the Article I, section 18, guarantee of "just compensation" does not allow that result.

■    The city's retort—that there is nothing unjust about valuing the plant at $0 because the Utility Defendants recouped their investment costs during the sale of their developments—again confuses the ratemaking process with condemnation law. In the ratemaking process, the concern is whether the utility is allowed a reasonable return on its investment. In that regulatory context, it matters how utility property has been acquired and whether the utility has already recouped its costs. In an eminent domain case—a case in which the government is actually *taking* private property—the question is entirely different. For purposes of Article I, section 18, it does not matter how the utility acquired the property or whether it has already recouped the cost of that property from others; what matters is that the utility receive just compensation for the property that is being taken from it. For that reason, and the others stated above, we reject the city's first assignment of error; no fixed principle of eminent domain law precluded the trial court from considering the cost approach in determining the fair market value of the utility or otherwise required the court to use the city's income approach.

The city's second through fourth assignments of error take issue with particular aspects of the court's valuation—what the city characterizes as the trial court's erroneous "application" of the various approaches. As discussed above, the trial court's choice among legally permissible valuation methods is ultimately an issue of fact. The questions raised by the city's arguments, though masquerading as issues of law, ultimately hinge on what evidence the trial court found most persuasive regarding the fair market value of the Juniper system. Suffice it to say that there is evidence in the record to support the trial court's findings in that regard, and we reject the city's second, third, and fourth assignments of error without further discussion.

■ The fifth assignment of error, however, is a different matter. The trial court awarded the Utility Defendants "severance damages" in the amount of $168,996 for an effluent pipe that was not taken by the city but that was "stranded" as a result of the city's taking. In condemnation law, severance damages represent the depreciation in the fair market value of the condemnee's remaining property caused by the taking. *Lundberg*, 312 Or at 574 ("In the case of a partial taking of property, the measure of damages is the fair market value of the property acquired plus any depreciation in the fair market value of the remaining property caused by the taking."); *State Highway Comm. v. Hooper*, 259 Or 555, 560, 488 P2d 421 (1971) ("The depreciation in market value to the remaining land is often called severance damages.").

The trial court awarded severance damages in the belief that the effluent pipe was owned by Juniper Utility Company The evidence, however, established that the company did not own that pipe, and the Utility Defendants concede on appeal that "the trial court should not have allocated severance damages for [the] stranded effluent pipe to Juniper Utility." We accept the concession and agree that the judgment must be reversed with respect to that award of severance damages.

The city's sixth assignment of error likewise concerns severance damages. The city argues that the trial court erred as a matter of law in using a "restoration cost" and "substitute facility" approach when awarding severance damages for nine holes of the Mountain High golf course, part of J. L. Ward Company's Mountain High development that had been served by Juniper Utility Company. The condensed version of the story is that, after Juniper Utility Company was regulated and its rates were reduced, J. L. Ward Company allowed the golf course to dry up; the Mountain High Homeowners Association sued, and the trial court entered a judgment ordering J. L. Ward Company to maintain the golf course.[14] However, once the city took over the Juniper system, J. L. Ward Company no longer had control of the water source to irrigate the golf course.

[14] For the longer version, see *Mountain High Homeowners Assn. v. J. L. Ward Co.*, 228 Or App 424, 209 P3d 347 (2009).

As part of this action, J. L. Ward Company argued that it was entitled to severance damages for the costs of rebuilding the course, complete with a new irrigation and delivery system. Without its own irrigation system, the company argued, it could not guarantee an adequate supply of affordable water, which was necessary to comply with the judgment in favor of the Mountain High Homeowners Association. The trial court agreed that severance damages were required and that "replacement cost new of the irrigation system, less depreciation in the distribution system, is the appropriate measure of damages." Those severance damages totaled $1,010,828.

■     On appeal, the city argues that the cost of reproducing of the irrigation system was, as a matter of law, an impermissible measure of severance damages in this case. According to the city, reproduction costs are an appropriate measure of severance damages only if those costs are *less than* the diminution in fair market value to the condemnee's remaining property. The city is correct. In *Tunison v. Multnomah County*, 251 Or 602, 604-05, 445 P2d 498 (1968), the court explained the interplay between reproduction costs and depreciation in fair market value:

> "The measure of damages for a taking by eminent domain is the fair market value of the strip taken plus any depreciation in the fair market value of the land remaining caused by the taking.[1] *However, if the cost of restoring the remaining property to the same condition it was in before the taking is less than the depreciation in the market value caused by the taking, then the owner is entitled only to the cost of restoration.*[2]

---

"[1] *Pape v. Linn County*, 135 Or 430, 296 P 65 (1931).

"[2] 'Inasmuch as the measure of damages is the decrease in market value of the land, and the trained judgment of the market in determining value would take into consideration the possibility of restoring the damaged property as far as possible to the same relative position in which it stood before the taking if the cost of such restoration would be less than the increase in market value which it would bring to the land, the condemnor is entitled to the adoption of the

> criterion of damage which produces the smaller result.'
> 5 *Nichols on Eminent Domain*, § 23.2, p. 537 (1962)."

(Emphasis added.); *see also id.* at 605 n 3 ("5 *Nichols on Eminent Domain*, supra at p. 537: '[E]vidence of the cost of restoring the property as far as possible to its original relative position, when offered by the owner, is admissible only when there is also evidence that such cost is no greater in amount than the decrease in market value of the property if it is left as it stood.' "); *Highway Com. v. Central Paving Co.*, 240 Or 71, 77, 399 P2d 1019 (1965) ("cost of replacing the area of land taken by filling in adjacent land" was not a proper element of just compensation).

In other words, the rule is that restoration costs are a proper measure of severance damages only where there is corresponding evidence from which the trier of fact can conclude that the cost of restoration is *less than* the diminution in fair market value caused by the taking. Here, J. L. Ward Company does not identify any evidence that it presented that would satisfy the *Tunison* rule—that is, evidence that the diminution in value as a result of the condemnation of the Juniper system was greater than the cost of a new irrigation system. Rather, it contends that the rule in *Tunison* is simply inapposite because of the legal obligation imposed on J. L. Ward Company to supply water to the golf course.

That legal obligation, according to J. L. Ward Company, triggered what is known as the "substitute facility" doctrine, which this court discussed in *1st Meth., Ashland*, 6 Or App at 494-95 (explaining that "substitution" or cost of reproduction can be an appropriate measure of fair market value when the condemned property performs "a legally necessary function"). *See also Dept. of Trans. v. Southern Pacific Trans. Co.*, 89 Or App 344, 347 n 2, 749 P2d 1233, *rev den*, 305 Or 671 (1988) ("Reproduction costs are appropriate in determining just compensation when the condemnee is under a legal obligation to replace condemned property. *Bd. Higher Ed. v. 1st Meth., Ashland*, 6 Or App 492, 495, 488 P2d 835 (1971).").

As we have previously discussed in the context of the city's first assignment of error, 242 Or App at 23-26, there are certain circumstances in which reproduction costs can be

used to determine the fair market value of condemned property. One of those circumstances is where the property owner is legally required to build a "substitute facility" to replace the condemned property, and the fair market value of the condemned property is not capable of being established by other means. *See 1st Meth., Ashland,* 6 Or App at 495-97 (discussing that "substitute facility" approach but rejecting it where neither of those requirements was met); *see also United States v. 50 Acres of Land,* 469 US 24, 105 S Ct 451, 83 L Ed 2d 376 (1984) (limiting use of "substitute facility" doctrine in federal takings to circumstances in which fair market value of condemned property cannot be determined by usual means).

J. L. Ward Company's reliance on the "substitute facility" doctrine misses the mark, however. The city's sixth assignment of error does not concern the value of the condemned property—*i.e.*, the utility system. Rather, it pertains to the award of severance damages, an award that represents the loss in value to J. L. Ward Company's *remaining property*. Said another way, the question is not the fair market value of the condemned utility, but the loss in fair market value of the *golf course*.

Viewed in that light, the trial court erred in valuing the diminution based on the cost of a "substitute facility." Even assuming that the substitute facility doctrine applies to the determination of severance damages, this is not the case in which to apply it. As in *1st Meth., Ashland,* J. L. Ward Company has not identified any reason why the fair market value of the golf course—even saddled by a judgment that it be maintained—could not have been determined based on a market valuation, and, correspondingly, why it was not possible to determine the diminution in its fair market value as a result of the condemnation of the Juniper system. Accordingly, the judgment must be reversed and remanded for the trial court to consider severance damages in terms of diminution in fair market value of the golf course, the legal standard described in *Tunison*.

The city's seventh assignment pertains to the trial court's award of attorney fees. Because we have partially

reversed the trial court's award of just compensation, we likewise reverse the accompanying attorney fee award. *See* ORS 20.220(3)(a) ("If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed."). At the very least, the trial court will need to reconsider the amount of the fee award in light of the reduction in compensation. *See* ORS 20.075(2)(d) (in determining amount of attorney fees, court "shall consider," among other factors, the "amount involved in the controversy and the results obtained"). We therefore decline to address the city's seventh assignment of error.[15]

## C. *Cross-Appeal*

We turn, then, to the Utility Defendants' cross-appeal. They advance two assignments of error. First, the Utility Defendants contend that the trial court erred in its valuation of certain "blanket easements." Those easements were donated to Juniper Utility Company by property owners to allow the utility to install a utility corridor and serve properties other than the grantor's property. The trial court concluded that the easements would not add anything to the fair market value of the utility:

> "[E]asements are typically given to utility providers, particularly for pipes and other underground utilities, for no cost. Utility access makes the ground more valuable. In most instances, real estate cannot be subdivided or developed without utility service and access. The utility provider would not pay for the right to put pipe in the ground in property which would benefit from the infrastructure. A willing buyer simply would not pay value for what is normally given away."

---

[15] The assignment pertains to the trial court's determination of "bad faith" under ORS 35.346(7)(b) (2001). The trial court, however, awarded attorney fees on an alternate and independent basis: that the verdict exceeded the city's 30-day offer, ORS 35.346(7)(a) (2001) (court shall award attorney fees "[i]f the amount of just compensation assessed by the verdict in the trial exceeds the highest written offer in settlement submitted by condemner to those defendants appearing in the action at least 30 days prior to commencement of said trial"). In fact, the court expressed its reluctance to address the parties' arguments concerning ORS 35.346(7)(b), given that the Utility Defendants were entitled to fees under paragraph (a) of that statute. It is not clear whether the court will even need to reach ORS 35.346(7)(b) on remand, if the Utility Defendants are entitled to attorney fees under ORS 35.346(7)(a).

The Utility Defendants argue that the trial court's reasoning was erroneous in that regard, because "[t]here is no evidence in the record that a utility owner would consider these blanket easements worthless."

The question of fair market value of the easements is, as Utility Defendants acknowledge, one of fact. For that reason, we will not disturb the trial court's finding that the easements lacked independent value to the utility unless there is no evidence to support that finding. The Utility Defendants cannot reach that high bar on appeal. Their own appraiser testified that real estate developers customarily convey or sell easements to utilities for "no charge." We therefore reject the Utility Defendants' first assignment of error on cross-appeal.

In their second assignment of error, the Utility Defendants contend that the trial court misconstrued ORS 82.010, the statute governing the accrual of post-judgment interest.[16] That statute provides, in part:

> "(2)   Except as provided in this subsection, the rate of interest *on judgments for the payment of money* is nine percent per annum. The following apply as described:
>
> "* * * * *
>
> "(c)   Interest accruing from the date of the entry of a judgment shall also accrue on interest that accrued before the date of entry of a judgment."

(Emphasis added.) After the verdict was rendered in their favor, the Utility Defendants requested that post-judgment interest run on interest that had accrued before the entry of judgment—*i.e.*, post-judgment interest on prejudgment interest.[17] The court denied that request, reasoning that a condemnation judgment is not a "judgment for the payment of money" within the meaning of ORS 82.010.

---

[16] Although we have partially reversed the judgment, the issue of post-judgment interest will arise on remand, and we therefore address it.

[17] Prejudgment interest is "deemed a part of the damages suffered by the defendants as a result of the appropriation" where, as in this case, the condemner took possession of the property before the property was condemned. *State Highway Com'n v. Deal et al.*, 191 Or 661, 684, 233 P2d 242 (1951).

Judgments in condemnation cases are governed by ORS 35.325, which provides:

> "Upon the assessment of the compensation by the jury, *the court shall give judgment appropriating the property in question to the condemner, conditioned upon the condemner's paying into court the compensation assessed by the jury*; and, after the making of such payment, the judgment shall become effective to convey the property, and the right of possession thereof to the condemner if not previously acquired."

(Emphasis added.) Said otherwise, "the judgment in a condemnation case is, by statute, a conditional judgment." *State ex rel English v. Multnomah County*, 348 Or 417, 438, 238 P3d 980 (2010). In fact, even after a verdict on just compensation is rendered, the condemner still has the option of abandoning the condemnation. *See* ORS 35.335(3) ("An action is considered abandoned if, at any time after filing a complaint, the case is dismissed or terminated or the condemner files an election not to take the property. If an election is not filed within 60 days after the verdict, the condemner is considered to have elected to take the property.").

The "conditional" nature of a condemnation judgment, the trial court ruled, was critical. The court explained that "the condemnation judgment will not *require* the payment of money," but will instead "appropriate property *conditioned* on the payment of money." (Emphasis by trial court.) By contrast, the court ruled, a "judgment for the payment of money" must actually *require* the payment. To that end, the court determined that the phrase "judgment for the payment of money" in ORS 82.010 means a "money award" as defined in ORS chapter 18, which, in turn, refers to a "judgment or portion of a judgment that requires the payment of money." ORS 18.005(14) (defining "money award"); *see also* ORS 18.042(1) (judgments that include a money award "must contain a separate section clearly labeled as a money award").

On appeal, the Utility Defendants argue that the trial court's ruling is inconsistent with the plain text of ORS 82.010 and ORS 35.325. We agree. The phrase "judgment for the payment of money" in ORS 82.010 is not synonymous

with "money award" in ORS chapter 18. ORS 82.010 long antedated the term "money award," which was added to ORS chapter 18 in 2003 as part of an overhaul of the law regarding the form and content of judgments generally. *See* Or Laws 2003, ch 576 (containing the complete text of the so-called "judgments bill," HB 2646); Or Laws 1987, ch 873, § 26 (enacting provision regarding "interest on judgments for the payment of money"). We are not aware of any statutory text, context, or legislative history that would suggest those 2003 amendments were intended to address the law regarding entitlement to post-judgment interest under ORS 82.010.

▪ In our view, the question is not one of form (whether a condemnation judgment should be reduced to the form of a "money award" under ORS chapter 18) but rather one of substance: Is a condemnation judgment a "judgment for the payment of money"? Framed in that way, a condemnation judgment, whether conditional or not, is "for the payment of money." Indeed, for the judgment to have any effect at all, the condemner must "*pay*[ ] into court the *compensation* assessed by the jury." ORS 35.325 (emphasis added). The fact that the condemner can abandon the condemnation effort does not, in our view, alter what is, fundamentally, a judgment for the payment of money. The trial court erred in concluding otherwise.

In sum, we reject the city's arguments that the court erred as a matter of law in valuing the condemned utility plant based on the cost approach, and we therefore do not disturb on appeal the trial court's award of just compensation as to the Juniper system property. However, we conclude that the trial court erred in awarding severance damages regarding the stranded effluent pipe and the Mountain High golf course. We therefore reverse and remand for the trial court to reassess those aspects of the compensation award, and to then reconsider the questions of post-judgment interest and attorney fees.

On appeal, reversed and remanded for reconsideration of severance damages and attorney fees; otherwise affirmed. On cross-appeal, reversed and remanded to reconsider post-judgment interest; otherwise affirmed.