Argued and submitted December 1, 2020, affirmed April 6, 2022

In the Matter of the Marriage of

Elizabeth Louise PILLER,
*Petitioner-Respondent,*
*and*

Stephen Louis PILLER,
*Respondent-Appellant.*

Washington County Circuit Court
C033682DRA; A171362

508 P3d 553

In this dissolution case, husband appeals three supplemental judgments dividing various deferred compensation accounts between the parties. Husband and wife were divorced in 2004. The trial court issued a dissolution judgment awarding wife half the value of husband's PERS member's account and directed wife to submit a Qualified Domestic Relations Order (QDRO) to the court. Wife did not submit the QDRO until almost 15 years later, resulting in three supplemental judgments. Those judgments awarded wife her share of husband's deferred compensation accounts, a portion of the PERS benefit payments that husband alone had received after his retirement, and a percentage of husband's gross monthly retirement benefit going forward. On appeal, husband argues that the supplemental judgments are inconsistent with the unambiguous terms of the dissolution judgment, and that the trial court used an incorrect rate of return in calculating the growth of his deferred compensation account. *Held*: The Court of Appeals concluded that the 2004 dissolution judgment did not unambiguously preclude the trial court from entering supplemental judgments awarding wife a share of husband's retirement benefits. Husband's interpretation of the 2004 judgment was at odds with the language of the administrative rules governing the division of retirement benefits in place when the 2004 judgment was entered. The court further concluded that the trial court did not err in calculating the growth of husband's deferred compensation account, because husband provided no evidence to support that his proposed rate of return was more accurate than the rate ultimately adopted by the trial court.

Affirmed.

Kathleen J. Proctor, Judge.

Chelsea D. Armstrong argued the cause for appellant. Also on the briefs was Armstrong Chai, LLC.

Laura Graser argued the cause and filed the brief for respondent.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and Kistler, Senior Judge.*

KISTLER, S. J.

Affirmed.

_____

* Lagesen, C. J., *vice* DeVore, S. J.; Kistler, S. J., *vice* DeHoog, J. pro tempore.

**KISTLER, S. J.**

In this dissolution case, husband appeals three supplemental judgments dividing various deferred compensation accounts between the parties. He argues that the supplemental judgments are inconsistent with the unambiguous terms of the dissolution judgment and that the trial court used an incorrect rate of return in calculating wife's share of one deferred compensation account. We affirm.

Husband and wife were married from September 2, 1993 until August 17, 2004, when the Washington County Circuit Court entered a stipulated dissolution judgment. The dissolution judgment recites that, during their marriage, wife was a member of the Public Employees Retirement System (PERS) and that husband "ha[d] retirement accounts established at PERS and ING[, later renamed Voya], and may have an account with Aetn[a] Life Insurance and Annuity Co." The judgment sets out the approximate value of those accounts at the time of dissolution: $5,498 for wife's PERS account and $141,581 for husband's accounts. The judgment then provides that, "[t]o the extent retirement accounts exis[t], they shall be divided equally between the parties." Finally, the judgment directs wife to submit a Qualified Domestic Relations Order (QDRO) and retains jurisdiction "over these matters until the intent of this paragraph is carried out."[1]

Wife did not submit a QDRO to the court for 15 years. In the interim, husband retired. He elected to take a "lump sum option 2" payment of his PERS pension benefits; that is, at retirement, PERS paid husband a lump sum based on the amount in his member's account and a monthly benefit based on the amount of contributions that his employer

---

[1] Beyond the facts stated in the 2004 dissolution judgment, the record is sparse. The supplemental judgments, which husband challenges, recite some historical facts that we assume are based on information obtained by the attorney who prepared the QDRO. However, except for a worksheet identifying some of the attorney's preliminary assumptions and statements that PERS sent to husband, the information and methodologies that the attorney used to prepare the QDRO are not included in the record. To the extent that the historical facts stated in the supplemental judgments and the underlying documentation are undisputed, we rely on them.

made to the PERS Fund.[2] Husband also received a distribution from his deferred compensation plan and a distribution from his PERS Individual Account Plan (IAP). Because neither husband nor wife notified PERS or the custodian of husband's deferred compensation plan of the 2004 dissolution judgment, all the benefits from those accounts were paid directly to husband after he retired in 2014. Husband rolled the lump-sum payment, the distribution from his deferred compensation plan, and the distribution from his IAP into an IRA at Raymond James.

In 2019, wife retained an attorney, Ann Mercer, to prepare a QDRO, which resulted in three proposed supplemental judgments. The first proposed supplemental judgment was directed to Raymond James. It awarded wife $187,237.22 for her share of the retirement benefits that husband had rolled into his Raymond James IRA—the lump-sum payment from PERS, the distribution from husband's IAP account, and the distribution from his deferred compensation account. Additionally, the first proposed supplemental judgment awarded wife $36,576.89 for her share of the monthly PERS benefit payments that husband alone had received from 2014 to 2019.

The second proposed supplemental judgment was directed to PERS and awarded wife prospectively 29.54 percent of the "gross monthly retirement benefit currently being paid to" husband. The second supplemental judgment does not disclose the methodology Mercer used to determine that wife was entitled to 29.54 percent of husband's monthly PERS benefit.

The third proposed supplemental judgment was directed to PERS and awarded husband a share of wife's PERS benefits. We do not describe that judgment further. As explained below, having stipulated to the third supplemental judgment, husband may not challenge it on appeal.

Before wife submitted the proposed supplemental judgments to the court, husband filed an anticipatory objection.

---

[2] Wife asks us to take judicial notice of a booklet prepared by PERS explaining various payment options at retirement, including a "lump sum option 2" payment. Husband has not objected to wife's request, and we take judicial notice of the booklet, which is consistent with ORS 238.305.

Later, wife filed a motion to show cause why the proposed supplemental judgments should not be signed; the court ordered husband to show cause; and husband filed an answer in response to the court's show-cause order. Husband's answer expanded on his anticipatory objection. Essentially, he argued that the terms of the 2004 dissolution judgment can be read only one way: the value of the parties' retirement accounts at the time of dissolution should be divided equally between the parties. Husband reasoned that, because the dissolution judgment referred to retirement accounts and did not mention retirement benefits, it permitted division of the value of the retirement accounts at the time of dissolution but not the benefits that flowed from those accounts. He also appeared to take the position that wife was not entitled to any interest or growth on her share of those accounts between the entry of the dissolution judgment in 2004 and his retirement in 2014. Finally, he raised a separate objection to the rate of return that Mercer supposedly used to calculate the growth of his deferred compensation account between 2004 and 2009.

At the hearing on wife's show-cause motion, the court initially spoke with the parties, their counsel, and Mercer in chambers. That discussion was not recorded.[3] The court then went on the record and announced its decision. It disagreed with husband that the terms of the dissolution judgment unambiguously limited each party to half the value of the retirement accounts at the time of dissolution but none of the benefits that flowed from those accounts. In the court's view, the 2004 judgment permitted an equitable division of the parties' interest in both their retirement accounts and the benefits flowing from those accounts. The court did not expressly address husband's objection regarding the rate of return that Mercer supposedly had used. After announcing its ruling, the court asked husband if he wished to make a further record, and husband chose to rely on the arguments raised in his answer.

---

[3] The parties did not ask the court to record their discussion in chambers, nor did they summarize or otherwise memorialize their in-chambers discussion once the court went back on the record. *Cf. State v. Y. B.*, 296 Or App 781, 785, 439 P3d 1036 (2019) (explaining that ordinarily it is the appellant's obligation to put on the record an account of any critical proceedings occurring off the record).

On appeal, husband assigns error to two rulings. In his first assignment of error, he argues that the trial court erred in interpreting the 2004 dissolution judgment. In his view, that judgment unambiguously limited wife to half the value of his PERS member's account at the time of dissolution and, as he now acknowledges on appeal, interest on her half of that account. However, he reiterates that, under the terms of that judgment, she is not entitled to any part of the benefits that flowed from her share of his PERS member's account.[4]

Wife raises two procedural objections to husband's first assignment of error. She notes initially that each of the three supplemental judgments that the court signed is captioned as a "stipulated supplemental judgment." Based primarily on the caption, she argues that husband stipulated to the supplemental judgments and cannot challenge them on appeal. However, husband never signed or otherwise affirmatively manifested his assent to the first and second supplemental judgments. Indeed, he raised multiple objections to the entry of those judgments. We are not persuaded that husband is precluded from challenging those judgments on appeal. *Cf. State v. James*, 303 Or App 481, 482, 464 P3d 464 (2020) (discussing the relative weight to be given the caption and body of a judgment).[5]

Wife raises a second procedural objection. She argues that husband failed to preserve his argument that she is

_____

[4] Mercer's preliminary notes suggest that she recommended (and the trial court divided) the value of husband's IAP and deferred compensation accounts at the time of dissolution equally between the parties and awarded wife earnings on her share of those accounts. Husband does not argue otherwise on appeal. Rather, his first assignment of error appears to focus on the trial court's decision to award wife a share of the retirement benefits that flowed from his PERS member's account.

[5] After husband filed this appeal, PERS discovered an error in the third supplemental judgment giving husband a share of wife's PERS benefits. To correct that error, the court entered a judgment captioned "Stipulated Corrected Supplemental Judgment (Domestic Relations Order - Award to [Husband])." Unlike the first two supplemental judgments, which were merely captioned "stipulated," both parties or their agents signed the corrected third supplemental judgment. We conclude that husband did, in fact, stipulate to the corrected third supplemental judgment, and we may not review his challenge to that judgment on appeal. *See Jensen and Jensen*, 169 Or App 19, 22, 7 P3d 691 (2000). We may, however, review his challenge to the first two supplemental judgments, which awarded wife a share of the lump sum payment and monthly payments that husband received from PERS.

entitled to only half the value of his PERS account at the time of dissolution. It may be, as wife argues, that the premises of husband's argument could have been stated more clearly. However, we are persuaded that husband sufficiently preserved the issue he seeks to raise on appeal—that the dissolution judgment unambiguously limits wife to half his PERS member's account at the time of dissolution and none of the associated benefits. *See State v. Walker*, 350 Or 540, 551, 258 P3d 1228 (2011) (holding that an abbreviated reference to an issue was sufficient to preserve it).

We accordingly turn to the merits of husband's argument that the dissolution judgment unambiguously provides that the value of his PERS member's account at the time of dissolution but not the associated PERS benefits shall be divided equally with wife. Husband's argument rests on the unexplained assumption that, in 2004, a judgment that referred only to dividing a PERS account necessarily foreclosed dividing the associated PERS benefits. In determining the meaning of the 2004 dissolution judgment, we begin with a brief discussion of the statutory and rule-based right to PERS benefits, as they existed in 2004, that flowed from husband's PERS member's account and wife's right to share in those benefits. Attempting to determine the meaning of the 2004 dissolution judgment without an understanding of the legal context that existed when the trial court entered that judgment is simply shooting in the dark.

Husband became a PERS member in 1991 and, as a result, was a Tier I PERS member. *See State v. Strunk*, 338 Or 145, 158, 108 P3d 1058 (2005) (defining Tier I PERS members). Before the 2003 PERS reform legislation went into effect, a Tier I PERS member contributed six percent of his or her salary to a regular "member" account,[6] and the member's employer paid an equivalent amount to the PERS Fund based on an actuarial evaluation. *See id.* at 158-60, 164 (discussing PERS members' and PERS employers' respective obligations). When a Tier I PERS member became eligible for retirement, the member would receive a pension benefit

---

[6] The regular member account consisted of the employee's contributions and the earnings that the PERS Board credited annually to those contributions. *Strunk*, 338 Or at 158.

calculated using one of two formulas: money match or full formula. *Id.* at 160.[7] By statute, PERS used the formula that resulted in the higher benefit to the member. *Id.* at 161.

Essentially, under money match, PERS doubled the amount of money in the member's regular account at the time of retirement. *Id.* A member could elect to annuitize the doubled amount, receive it as a lump sum, or receive it as a combination of the two. *See* ORS 238.305. Under the full formula approach, PERS calculated the pension benefit a member would receive by multiplying the member's final average salary by a statutorily determined percentage (1.67 percent for most members), and then multiplying the resulting number by the member's years of service. *Strunk*, 338 Or at 160-61.

By 2003, the gross annual pension benefit produced by using the money match formula approached and sometimes exceeded a member's gross annual wages. *See id.* at 162-63. The legislature became concerned that paying the increased pension benefits resulting from the money match formula threatened the fiscal integrity of the PERS Fund, and it enacted legislation that, over time, effectively reduced the use of that formula. *See id.* Among other things, the 2003 legislation created an IAP for each member and directed that, after the effective date of the 2003 act, six percent of each member's salary would be credited to the member's IAP rather than being credited to the member's regular account. *Id.* at 164. The court upheld that statutory change against a claim that it impaired PERS members' state constitutional rights. *Id.* at 192.

Given those statutory principles, the trial court reasonably could have found that, as a result of the 2003 PERS legislation, no employee contributions were credited to husband's regular member's account after the dissolution judgment.[8] It follows that, under the terms of the 2004 dissolution

---

[7] A third formula was available for PERS members who began service before 1981. *See Strunk*, 338 Or at 160. Because husband became a PERS member in 1991, that formula could not be used to calculate his retirement benefits.

[8] As noted above, the record includes a worksheet in which Mercer set out some of her assumptions in calculating each party's share of the other's retirement benefits. One of her assumptions, which is consistent with the 2003 legislation, is that no employee contribution was credited to husband's regular member's account after the parties' 2004 divorce.

judgment, wife was entitled to half the amount in husband's regular member's account plus accrued earnings.

The question that husband raises, however, is whether the 2004 dissolution judgment granting wife half his member's account also granted her a share of the associated benefits. On that issue, the 2003 version of the PERS statutes specified that a dissolution judgment may provide "[t]hat the alternate payee [the member's former spouse] may elect to receive payment in any form of pension, annuity, retirement allowance *** or other benefit [except a joint and survivor annuity] that would be available to the member under this chapter."[9] ORS 238.465(2)(b) (2003). The statute also authorized the PERS Board to adopt rules to carry out that legislative intent. *See* ORS 238.465(3) (2003).

Pursuant to ORS 238.465(3) (2003), the PERS Board adopted rules that were in effect in 2004; among other things, the 2004 rules authorized a trial court to enter a preretirement order directing PERS to establish a separate account in the former spouse's name as an alternate payee and to fund that account by transferring a percentage of the member's account to the alternate payee's separate account. OAR 459-045-0010(1)(c) - (g) (2004).[10] Once the separate account was established, the alternate payee would be entitled to interest on that account and also "would be eligible for benefits based on the member's eligibility for benefits regardless of whether or not the member elects to begin receiving benefits." OAR 459-045-0010(1)(h) - (j) (2004). Put in the context of this case, if wife had filed a QDRO shortly after the court entered the 2004 dissolution judgment, OAR 459-045-0010(1) (2004) would have authorized the trial court to enter a preretirement supplemental judgment that directed PERS to take half of husband's regular member's account at the time of dissolution and use it to fund a new separate account for wife, which would have entitled her to

---

[9] ORS 238.465 has been amended numerous times since the judgment in the underlying case was entered. We refer to the version of the statute that was effective as of August 17, 2004.

[10] As noted, we look to the version of the administrative rules that existed in 2004 because they provided the backdrop against which the trial court and the parties crafted the 2004 stipulated dissolution judgment.

interest and PERS benefits based on her share of husband's PERS member's account.

Alternatively, the trial court could have entered a supplemental judgment awarding wife "a portion of future benefits that become due and payable by PERS to [husband]." OAR 459-045-0010(2) (2004). One method the 2004 rules provided for determining the former spouse's share of the benefits that would become due and payable to the member was to "award [the former spouse] a percentage of the total PERS funds that were accrued during the marriage." OAR 459-045-0010(2)(a); *see* OAR 459-045-0010(2)(b)(B) (2004) (illustrating that methodology). We express no opinion on whether that methodology would be appropriate here. Our point is narrower. That rule is at odds with husband's argument that the reference in the 2004 dissolution judgment to dividing the amount of husband's retirement accounts necessarily precluded wife from sharing in the benefits flowing from husband's PERS member's account.

To be sure, wife did not submit a QDRO until after husband had retired, and the trial court did not enter either a preretirement order or one that directed PERS to divide husband's benefits at the time of payment. However, both methodologies set out in the 2004 rules directly refute the assumption that underlies husband's argument—that a 2004 dissolution judgment that referred only to dividing the value of a PERS member's account necessarily reflected an intent to preclude the member's spouse from sharing in the associated PERS benefits. If anything, that context leads to precisely the opposite conclusion.

Beyond that context, we note that, simply as a matter of text, the absence of an express statement in the 2004 dissolution judgment regarding wife's entitlement to participate in husband's PERS retirement benefits undercuts husband's argument that the dissolution judgment unambiguously precluded a supplemental judgment that awarded her a share of those benefits. The 2004 judgment is simply silent on that issue. Finally, the 2004 judgment provides that "[t]he court shall have jurisdiction over these matters until the *intent* of this paragraph is carried out." (Emphasis added.) By referring to the "intent" of the paragraph, the judgment

suggests that the court retained jurisdiction to ensure that later supplemental judgments reflected the dissolution judgment's intent, not a specific plan of distribution, or at least the text and context permit that inference.

Our holding in this case is narrow. Husband has argued only that the 2004 dissolution judgment unambiguously precluded the trial court from entering supplemental judgments that gave wife a share of his retirement benefits. For the reasons explained above, we do not read the judgment that restrictively. Beyond that, we express no opinion on whether the supplemental judgments that the court entered divided husband's PERS benefits appropriately between husband and wife. Beyond arguing that wife was not entitled to any part of his PERS benefits, husband has not argued on appeal that the court erred in calculating the amount of those benefits that it awarded her.

In his second assignment of error, husband argues that the trial court used an incorrect rate of return to determine the growth of his deferred compensation account from 2004 to 2009. On that issue, the record discloses that Voya was the custodian of husband's deferred compensation account at all relevant times. However, as Mercer noted in setting out her preliminary assumptions, "no records [we]re available [from Voya] for earnings in [husband's deferred compensation account] between August 12, 2004 and December 31, 2009."[11] Mercer also noted that husband's "IAP, which is also invested with Voya, had a return of 29.27%" from 2004 to 2009. She proposed using the same rate of return to determine the growth of husband's deferred compensation account and asked husband's attorney whether he agreed.

The record does not disclose what communications, if any, husband's attorney had with Mercer before she prepared the first supplemental judgment. It also does not disclose whether Mercer, in fact, ended up using the IAP rate of return or some other rate of return to determine the growth in husband's deferred compensation account between 2004 and 2009.

---

[11] Mercer noted that records were available from Voya after 2009.

When husband filed his answer to the show-cause order, his answer assumed that Mercer had used the IAP rate of return. Husband's lawyer asserted, in the answer, that husband's

"IAP is known to have been invested in a much more conservative set of funds in that period than other Voya-managed plans including the [deferred compensation account] in question. [Husband's] accounts were invested largely in stocks and not more conservative assets. [Husband's] Voya-managed fund investments track more closely to the S&P 500 during this period, which had a return for the period of 4.88%."

It followed, husband's lawyer argued, that Mercer should have used the return for the S&P 500 to calculate the growth of husband's deferred compensation account from 2004 to 2009.

We assume from husband's answer that Voya offered employees, such as husband, a menu of funds in which the employee's deferred compensation account could be invested until retirement. However, other than arguing that his deferred compensation account was invested in riskier stocks than his IAP account, husband failed to identify the funds or types of funds in which his deferred compensation account was invested and how those funds compared to the S&P 500. For all that the record reveals, husband's deferred compensation account could have been invested in international stocks, emerging market stocks, or small cap funds while the S&P 500 could have focused on a different segment of the market.[12] Not only did husband's argument fail to identify the nature of his investments beyond asserting that he invested in less conservative stocks than his IAP, but he offered no evidence, not even an affidavit, to support the factual assertions that his lawyer made in the answer.

We do not question the good faith of husband's trial lawyer, nor are we unaware that, sometimes, parties tacitly agree to rely on factual assertions that their lawyers make in argument without offering supporting evidence, or at

---

[12] Moreover, the record does not disclose whether husband could have moved his deferred compensation from one fund to another in Voya, which would have permitted him to time the market in a way that the S&P 500 could not.

least choose to acquiesce in that practice. However, the trial court faced a difficult problem. As no one disputes, there was no way to determine the actual rate of return on husband's deferred compensation account from 2004 to 2009. The records were missing. Neither rate of return proposed by the parties necessarily matched the rate of return that husband's deferred compensation account actually realized, and the trial court had to choose between two imperfect solutions.

We cannot say that, in these circumstances, the trial court erred in relying on Mercer's proposed rate of return. Although wife had retained Mercer to prepare the QDRO, the dissolution judgment provided that husband and wife would share her fee equally. The trial court reasonably could have regarded Mercer as a neutral expert, whose recommendation was not tinged by an advocate's perspective. Conversely, the trial court reasonably could have recognized that the factual assertions underlying husband's proposed rate of return reflected a litigation position. That is particularly true since husband offered no evidence to support his lawyer's factual assertions.[13] In these circumstances, the trial court did not abuse its discretion to the extent it accepted Mercer's recommendation to use the rate of return in husband's IAP from 2004 to 2009.[14] *Cf. City of Bend v. Juniper Utility Co.*, 242 Or App 9, 21, 252 P3d 341 (2011) (recognizing trial court's discretion to choose between competing valuation methods in a condemnation proceeding).

Affirmed.

---

[13] On appeal, husband asserts that the trial court erred in not allowing him to offer evidence to support his rate-of-return argument. Husband, however, identifies no instance in which he sought to offer evidence on that issue, nor has he identified any ruling by the trial court prohibiting him from doing so. To the extent that husband is referring to rulings, if any, that occurred in chambers before the hearing, it was husband's obligation, as the appellant, to put those rulings on the record if he wished to assign error to them on appeal. *See Dorn v. Three Rivers School Dist.*, 306 Or App 103, 118, 473 P3d 122 (2020) (stating general proposition); *Y. B.*, 296 Or App at 785 (same).

[14] Given our resolution of this issue, we need not decide whether husband's argument fails for another reason—namely, the record does not clearly disclose what rate of return Mercer ultimately used to determine the growth in husband's deferred compensation account.